**Larry OWEN, Plaintiff,**

v.

**MBPXL CORPORATION d/b/a Excel Specialty Products, Defendant.**

**No. C01–4030–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Nov. 20, 2001.

---

**2.** The loss of consortium claim in Count VI was not put at issue by the City Defendants' motion for summary judgment.

Jay E. Denne of Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Sarah J. Kuehl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, IA, for Defendant.

MEMORANDUM OPINION AND OR-DER REGARDING DEFEN-DANT'S MOTION TO COMPEL ARBITRATION AND STAY PRO-CEEDINGS PENDING ARBITRA-TION AND REQUEST FOR EX-TENSION OF TIME TO FILE ANSWER

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ....................908
 A. The Parties, The Arbitration Clause, And The Underlying Dispute........908
 B. Procedural Background ............................................909

II. LEGAL ANALYSIS ......................................................911
 A. The Federal Arbitration Act And Excel's Motion To Compel Arbitra-
 tion And Stay Proceedings ........................................911
 1. History of the Federal Arbitration Act ..........................911
 2. What law governs the interpretation and construction of the
 agreement? ..................................................912
 B. The Validity Of The Dispute Resolution Plan............................913
 1. Elements of a valid contract under the Federal Arbitration Act:
 Ordinary principles of contract law .............................913
 2. Bilateral and unilateral contracts................................914
 3. Offer ........................................................918
 4. Acceptance ..................................................925
 5. Implied Contract ..............................................926
 C. Who Determines Arbitrability? ........................................927

III. CONCLUSION .........................................................930

In this employment discrimination litigation, the defendant has requested that the court compel arbitration and stay proceedings pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* The defendant operates, among other businesses, a meat processing plant in Orange City, Iowa. The plaintiff was employed by the defendant for over twenty years, and the underlying claims in this action assert a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.* The defendant, however, maintains that an arbitration agreement between the parties precludes the plaintiff from pursuing his claims in court. Consequently, the defendant seeks to compel arbitration. As a result, the court is called upon to determine (1) whether the parties have a valid agreement to arbitrate; and if so, (2) whether plaintiff's age discrimination claim falls within the scope of any such agreement. At the heart of this motion to compel

arbitration and stay proceedings is whether the arbitration agreement is a valid contract, because the plaintiff denies receipt of the agreement and the defendant offers little in the way of proof of its communication of the agreement.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

### A. The Parties, The Arbitration Clause, And The Underlying Dispute

The plaintiff, Larry Owen ("Owen"), worked for the defendant, MBPXL Corporation, doing business as Excel Specialty Products ("Excel"), for over twenty years. He began his long career with Excel in January of 1980. He was a supervisor at Excel's Witchita, Kansas plant from 1984–1986. He was then transferred to Excel's Rockport, Missouri facility and worked there from 1986 until 1992. In 1992, Owen became the production supervisor in Excel's Fort Branch, Indiana plant. However, the Indiana facility closed in 1999, and Owen was transferred to Excel's processing plant in Orange City, Iowa in March, 1999. Owen remained at the Orange City, Iowa facility until July of 2000. Owen claims that he was constructively terminated from his position as a supervisor and resigned in July of 2000 after being denied several promotions and at least one pay raise because of his age. Specifically, Owen maintains that Excel hired younger, less experienced people for positions that Owen was qualified to perform in 1992, 1997, and in 1999; that his transfer to the Orange City, Iowa plant after the Indiana plant closed in 1999 was the product of a hostile and pervasive atmosphere of age discrimination and harassment; and that in June of 2000, during his annual review, Alec Gordon, Excel's General Manager, told Owen that "when we get up in years like us, raises are few and far between." Pl.'s Compl. ¶ 13.

In February of 1998, Excel adopted a Dispute Resolution Plan ("DRP" or "Plan"). The Plan outlines an internal grievance procedure and is purportedly an arbitration agreement, the validity of which is at issue in this case. The court will discuss the Plan's provisions more fully in Section II. On October 19, 1999, Excel presented the DRP to the employees at the Orange City facility. Excel asserts that Owen received a copy of the DRP and has produced a signed training session attendance sheet, which Excel claims demonstrates communication of the Plan to Owen. As stated in the Plan itself, employees were deemed to have accepted the plan if they continued employment for thirty days after its presentation. Def.'s Ex. A (Art. 7.8). In his initial resistance to the defendant's motion, Owen stated that he received a copy of the Plan attached to the defendant's motion to compel arbitration, but further stated that he did not recall signing a document stating that he agreed to its terms. (Owen Dep. ¶ 2). In his supplemental deposition, Owen contends he could not have received the Plan attached to the defendant's motion, the reasons for which will be discussed more fully below. Owen did, however, continue his employment with Excel for a period greater than thirty days after the date on which Excel contends it communicated the Plan to Owen, i.e., from October 1999 until July 2000.

The DRP's grievance procedure culminates with binding arbitration. Before reaching the arbitration stage, however, the DRP calls for several intermediate steps, beginning with contacting the Human Resource Manager. The next step involves informing the body established by the DRP to handle disputes, Dispute Solutions, Inc. ("DSI"). Owen made a complaint to DSI in March of 2000, which Excel claims is still pending. Owen bypassed the next steps, which re-

quire requesting reconsideration, placing the complaint before a review committee, participating in mediation, and finally, entering into binding-arbitration. The DRP explicitly states that failure to follow the steps in the order outlined in the agreement is grounds for an arbitrator to rule against an employee.

### B. Procedural Background

On March 27, 2001, Owen filed his complaint alleging age discrimination pursuant to the ADEA, 29 U.S.C. § 623 *et seq.* Prior to filing this action, he filed a discrimination charge with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter. Pl.'s Exs. A, B. This action was filed within 90 days of receipt of the letter and, therefore, is timely. Under both Counts I and II of Owen's complaint, which allege age discrimination and retaliation in violation of the ADEA, Owen seeks compensatory and punitive damages, costs, and attorney's fees. Pl.'s Compl.

On May 29, 2001, in lieu of answering Owen's complaint, Excel moved to compel arbitration and stay proceedings. Excel contends that Owen's age discrimination claim is governed by the arbitration agreement between the parties. Accordingly, it maintains that under both the agreement and the FAA, Owen is precluded from pursuing his claim in court and must instead submit his claim to arbitration. Excel requests that this court stay proceedings pursuant to 9 U.S.C. §§ 3–4, which states in pertinent part that "[a] party aggrieved by the alleged failure of another to arbitrate under a written agreement for arbitration may petition any United States district court for an order directing that such arbitration proceed in the manner provided for in such agreement ...", 9 U.S.C. § 4, and that a court "upon being satisfied that the issue involved in [a] suit or proceeding is referable to arbitration

under [an] agreement [between the parties], shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Alternatively, Excel moves for an extension of time to file an answer until twenty days after disposition of the present motion before the court. Furthermore, Excel requests that the court order Owen to pay Excel's attorney's fees under the terms of the parties' arbitration agreement, which provide that "[a]ny Party that files a lawsuit ... in any court shall be liable for the other Party's attorney's fees to compel compliance with this Plan." Def.'s Ex. A (Art. 6.4).

Owen filed his resistance to Excel's motion on June 22, 2001. He advances several arguments in support of his resistance. First, Owen challenges the validity of the arbitration agreement itself. Essentially, he claims that Excel did not communicate the Plan to him; consequently, he asserts that he could not have accepted Excel's offer to enter into an arbitration agreement. Furthermore, he maintains that his silence was not an effective acceptance of the DRP and, therefore, that the DRP does not constitute a legally enforceable contract. In the alternative, Owen contends that the DRP is not enforceable because the terms of the plan are too indefinite to constitute a valid offer under ordinary principles of contract law. And finally, Owen asserts that by not responding to the grievance Owen filed with the DSI, Excel waived any right it may have had to compel arbitration.

In a bizarre procedural twist, the arbitration agreement Excel submitted to this court on May 29, 2001 apparently was submitted in error. The submitted agreement applied only to Texas employees. In addition, Owen's claims clearly fell outside its scope, which included only job-related

injuries.[1] Excel became aware of its error and requested on August 30, 2001 to postpone the August 31, 2001 hearing on this matter. The court granted Excel's request and established a briefing schedule in light of Excel's mistake and rescheduled the hearing on this matter for October 29, 2001. Accordingly, Excel submitted a supplemental brief on September 20, 2001, to which Owen responded on October 11, 2001.

In his response to the defendant's supplemental brief, Owen reasserts the arguments pursued in his first brief and press-

1. Specifically, in nearly every instance in which the original agreement referred to a dispute or difference, the limiting language of "relating to" or "arising out of" "on-the-job injuries and illnesses" followed, including:

 • Preamble: "The Plan is designed to fairly and efficiently resolve *any and all disputes related to on-the-job injuries and illnesses ....*"

 • Purpose: "The Plan is the required and exclusive way to deal with *any and all disputes related to on-the-job injuries and illnesses* between the Company and its Employees (the "Parties"). Neither the Company nor the Employees can sue the other in any court over differences based on a *Claim or Dispute arising out of or related to on-the-job related injuries or illnesses.*"

 • Employees' Rights: "YOU ARE WAIVING YOUR RIGHT TO LITIGATE IN COURT BY JURY OR NON–JURY TRIAL ANY *DISPUTE RELATED TO AN ON–THE–JOB INJURY OR ILLNESS ....*" (capitalization in original).

 • Article 2.1, General Provisions: "This Plan spells out the only way to deal with *any and all disputes or differences* between the Company and its Employees *related to on-the-job injuries and illnesses* once an Employee has exhausted his/her appeal rights pursuant to the Benefits Plan. Employees cannot sue in a court of law the Company or its officers, directors, employees or agents in their capacity as such or otherwise *that have to do with any job related Dispute or Difference.*"

 • Article 3.2, Powers of Plan Director: "These powers will be exercised consistent with the Benefits Plan provisions which represent the sole remedy *for on-the-job injuries and illnesses* for Employees."

 • Article 5.2, Arbitration: "If Mediation does not work, the Company and the Employee agree that the *Dispute or Difference concerning only on-the-job injuries*

 *and illnesses*, including, but not limited to, negligence and gross negligence as determined under and limited to the Benefits plan relief, shall be arbitrated."

 • Article 6.1, Mandatory Plan: "The Plan is the only way for Employees to solve their Differences or Disputes with the Company. Employees cannot bring a lawsuit in any court against the Company no matter what the subject of the Dispute or Difference or the seriousness of damages *as relates to an on-the-job injury or illness* and the application of the Benefits Plan."

Def.'s Ex. 1 (emphasis added).

Even though there are instances in which "dispute" was not limited by "on-the-job injury or illness," these provisions were, at best, ambiguous when read in the context of the agreement as a whole. For example, while the agreement provided that "the Parties agree to ultimately settle their differences or disputes in Arbitration rather than litigation (in court)," the plan continued to require arbitration for "Dispute[s] or Difference[s] concerning *only* on-the-job injuries and illnesses." Def.'s Ex. 1 (Employees' Rights, Art. 5.2) (emphasis added). Further, even though the plan provided that the parties would settle their disputes in arbitration, when enumerating employees' rights within in the same section of the agreement, the original DRP emphasized that employees are "WAIVING [THEIR] RIGHT TO LITIGATE IN COURT BY JURY OR NON–JURY TRIAL ANY DISPUTE RELATED TO AN ON–THE–JOB INJURY OR ILLNESS." Def.'s Ex. 1 (Employees' Rights) (emphasis in original). Similarly, the agreement further stated that "The Plan is the only way for employees to solve their Differences or Disputes with the Company." Def.'s Ex. 1 (Art. 6.1). Yet, the very next sentence provided that "Employees cannot bring a lawsuit in any court against the Company no matter what the subject of the Dispute or Difference or the seriousness of damages *as relates to an on-the-job injury or illness* and the application of the Benefits Plan." Def.'s Ex. 1 (Art. 6.1).

es that he could not have "accepted" the Plan because Excel failed to communicate it to him. The plaintiff does not dispute that he attended the October 19, 1999 meeting in which Excel asserts it distributed a summary of the Plan to employees. However, Owen maintains that there is no proof that the Plan itself was distributed, because the DSI representative stated only that he "distributed a summary of the Dispute Resolution Plan and played a videotape for the employees in attendance which explained the Plan, how it works, and the employees' rights." Bryant Aff. ¶ 5. In any event, Owen again argues the terms of the Plan are not sufficiently definite to create an offer; thus, there is no valid agreement between the parties.

Owen requested a hearing on his resistance to defendant's motion, which the court heard on October 29, 2001. Plaintiff was represented at the hearing by Jay E. Denne of Munger, Reinschmidt & Denne, Sioux City, Iowa. Defendant was represented by Sarah J. Kuehl of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., Sioux City, Iowa.

## II. LEGAL ANALYSIS

### A. The Federal Arbitration Act And Excel's Motion To Compel Arbitration And Stay Proceedings

#### 1. History of the Federal Arbitration Act

This court recently explored the history of the FAA in the context of a motion to compel arbitration and stay proceedings, in *Hoffman v. Cargill, Inc.,* 968 F.Supp. 465 (N.D.Iowa 1997) (*Hoffman I* ).

Congress enacted the FAA to abolish "the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts...." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974). Prior to its enactment, many states considered arbitration agreements to be revocable at will up until the time an arbitration award was issued. *Webb v. R. Rowland & Co.,* 800 F.2d 803, 806 (8th Cir.1986) (citing *Johnson Controls, Inc. v. City of Cedar Rapids, Iowa,* 713 F.2d 370, 376 (8th Cir.1983)); *Collins Radio Co. v. Ex–Cell–O Corp.,* 467 F.2d 995, 997–98 (8th Cir.1972). A primary goal of the FAA was to avoid this sometimes harsh result and to " 'place [arbitration] agreements upon the same footing as other contracts.' " *Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 270–72, 115 S.Ct. 834, 838, 130 L.Ed.2d 753 (1995) (quoting *Volt Information Sciences, Inc. v. Board of Trustees,* 489 U.S. 468, 474, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989)).

The Eighth Circuit Court of Appeals has observed that the FAA comprises a "statutory scheme for effectuating the federal policy of encouraging arbitration as a less costly and less complicated alternative to litigation." *Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163, 1165 (8th Cir.1984). Sections two through four of the FAA are key to motion[s to compel arbitration]. Section two provides that arbitration agreements contained in contracts involving maritime transactions or commerce are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Section three empowers federal courts to stay proceedings of issues referable to arbitration. 9 U.S.C. § 3. Section four directs courts, in certain circumstances, to compel the parties to arbitration pursuant to the terms of their written arbitration agreement. 9 U.S.C. § 4.

*Hoffman,* 968 F.Supp. at 470 (footnotes omitted).

The court employs a two-part inquiry to determine "whether [a] dispute is 'arbitrable' before it orders the parties to proceed with arbitration." *Id.* (citing *Daisy Mfg. Co. v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir.1994), in turn citing *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990) with accord in *Hodge Bros. v. DeLong Co.*, 942 F.Supp. 412, 415 (W.D.Wis. 1996)); *accord Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 679 (8th Cir. 2001); *Larry's United Super, Inc., v. Werries*, 253 F.3d 1083, 1085 (8th Cir.2001); *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir.1999). Under the first part, the court must ascertain whether a valid agreement to arbitrate exists between the parties. *Gannon*, 262 F.3d at 679. The court next determines whether the specific dispute falls within the scope of that valid agreement. *Id.* If the court answers these inquiries in the affirmative, under sections three and four of the FAA, the court must stay proceedings and compel the parties to submit their dispute to arbitration. *Lyster v. Ryan's Family Steak Houses*, 239 F.3d 943, 945 (8th Cir.2001) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (holding that the FAA mandates courts to direct parties to arbitration on issues to which a valid arbitration agreement has been signed); *Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 433 (8th Cir. 1998)). "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.*, 470 U.S. at 218, 105 S.Ct. at 1241, 84 L.Ed.2d at 163. Having reviewed the proper analytical framework for FAA claims, as well as the policies and goals behind the Act, the court now turns to Excel's motion.

## 2. What law governs the interpretation and construction of the agreement?

■ Although the parties did not raise the issue, the first question is what law controls the interpretation of this arbitration agreement.[2] The DRP includes a provision identifying governing law: "This Plan shall be governed, construed and enforced according to the Federal Arbitration Act (Title 9 of the United States Code) to the maximum extent possible." Def.'s Ex. 1 (Art. 7.5). The FAA, however, contains no substantive rules for contract interpretation. Consequently, state contract law governs. *Lyster*, 239 F.3d at 946; *see also Keymer v. Management Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir.1999) (same).

In this instance, there are several choices of law, including Iowa (because the Excel facility at which Owen was employed is located in Orange City, Iowa); Indiana (because several of Owen's claims of discrimination arose while employed by Excel in Indiana); Kansas (because it is Excel's principle place of business); and Delaware (because it is the state in which Excel is incorporated).

■ A federal court must apply the choice of law rules of the forum state—in this case, Iowa. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Iowa law, in turn, employs the Second Restatement's "most significant relationship" test to determine which state's law will govern a contract's interpretation. *See, e.g., Veasley v. CRST Intern., Inc.*, 553 N.W.2d 896, 897 (Iowa 1996) (recognizing Iowa's adoption of the "most significant relationship"

---

2. By relying exclusively on Iowa law, the parties apparently assumed it applied.

test); *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987) (same); *Cole v. State Auto. & Cas., Underwriters*, 296 N.W.2d 779, 781–82 (Iowa 1980) (same); *Berghammer v. Smith*, 185 N.W.2d 226, 231 (Iowa 1971) (same). Iowa has the most significant relationship to Owen's claims because (1) the most recent incidences of alleged age discrimination occurred while Owen was employed at the Orange City, Iowa facility, and (2) the arbitration agreement was allegedly formed while Owen was employed in Iowa.[3] *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 188(2) (absent choice by parties, court should consider place of contracting, of negotiation, of performance, of contract's subject matter, and parties' domiciles, residences, nationalities, places of incorporation, and places of business). Moreover, in the absence of a dispute between the parties, the court assumes Iowa law applies and, furthermore, seriously doubts the laws of contract interpretation in any of the alternative forums would be outcome-determinative.

## B. The Validity Of The Dispute Resolution Plan

### 1. Elements of a valid contract under the Federal Arbitration Act: Ordinary principles of contract law

 Federal law favors referrals to arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, parties who have not agreed to submit their disputes to arbitration cannot be required to do so. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 941–43, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (noting that the arbitrability of disputes depends upon whether the parties agreed to arbitrate); *accord Hoffman*, 968

F.Supp. at 476 ("[P]arties must not be forced to arbitrate disputes that they did not agree to submit to arbitration."). "That is because arbitration is simply a matter of contract between the parties." *Kaplan*, 514 U.S. at 943, 115 S.Ct. at 1924, 131 L.Ed.2d 985; *see also AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Consequently, whether parties indeed agreed to submit their dispute to arbitration depends in the first instance upon whether their written agreement constitutes an enforceable contract. *See Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 834 (8th Cir.1997) (citing *Daisy Mfg. Co.*, 29 F.3d at 392).

"Under the FAA, ordinary contract principles govern whether parties have agreed to arbitrate." *Id.* Further, "[w]hen deciding whether the parties agreed to arbitrate a certain matter ..., courts should apply ordinary state-law principles that govern the formation of contracts." *Kaplan*, 514 U.S. at 944, 115 S.Ct. 1920 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–63 & n. 9, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); G. Wilner, 1 Domke on Commercial Arbitration § 4:04, at 15 (Rev. ed. Supp.1993)); *accord AgGrow Oils, L.L.C. v. National Union Fire Ins. Co.*, 242 F.3d 777, 780 (8th Cir.2001) (applying North Dakota contract law to determine whether incorporation clause included arbitration provision); *Lyster*, 239 F.3d at 946 ("State contract law governs whether an arbitration agreement is valid."); *Keymer*, 169 F.3d at 504 (same). As discussed above, Iowa law guides the court's assessment of whether

---

**3.** Owen was transferred to the Orange City, Iowa facility in March of 1999. Excel contends it presented the DRP to the Orange City

plant in October of 1999 while Owen was employed there.

Excel and Owen entered into a valid agreement to arbitrate in this instance.

■■■ Under Iowa law, the elements of a valid contract are offer, acceptance, and consideration. *E.g., Taggart v. Drake Univ.,* 549 N.W.2d 796, 800 (Iowa 1996); *McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989) (same). While Owen challenges whether there was a valid offer and acceptance of the DRP, he does not raise the defense of lack of consideration. The Iowa Supreme Court refuses to address the issue unless raised by the parties. *See, e.g., Anderson,* 540 N.W.2d at 283 n. 3 (citing *Hubbard Milling Co. v. Citizens State Bank,* 385 N.W.2d 255, 258 (Iowa 1986) (examining adequacy of consideration only when lack of consideration defense is raised)). Nevertheless, it suffices to say that the DRP cites continued employment and the mutual promise to resolve disputes according to the terms of the plan as consideration. Under Iowa law, this type of consideration will support a contract. *See French,* 495 N.W.2d at 770 (continued employment provides consideration); *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989) (same); *McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989) (same).

### 2. *Bilateral and unilateral contracts*

■■■ In their briefs and at oral argument, the parties focused on the unilateral contract analysis employed by the Iowa Supreme Court in cases involving whether employee handbooks create employment contracts.[4] *See, e.g., Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 203–04 (1997) (finding employee handbook did not constitute offer on ground disclaimer

evinced intent of employer not to be bound); *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 283 (Iowa 1995) (holding employee handbook did not create employment contract). However, the handbook analysis is not applicable to this case, because that analysis addresses the existence of a unilateral contract, and the arbitration agreement at issue here is not such a contract.

Moreover, this court's conclusion that the employee handbook analysis is inapplicable to Excel's arbitration agreement is bolstered by the Iowa Supreme Court's employee handbook decisions themselves, which explicitly limit the application of the analysis to employee handbook cases. *E.g., Anderson,* 540 N.W.2d at 284. In *Anderson,* the Iowa Supreme Court altered the traditional rule of what constitutes an offer in the context of employee handbooks. *Id.* The court stated that "important policies, *which are confined to handbook cases,* dictate a narrow divergence." *Id.* (emphasis added). Because of the important policy considerations identified by the court, the *Anderson* court determined that it was "unnecessary that the particular employee seeking to enforce a promise made in an employee manual have knowledge of the promise." *Id.* at 285. This holding represented a departure from traditional contract analysis, which otherwise dictates that an offer is not effective until it reaches the offeree. *Id.; see also* RESTATEMENT (SECOND) OF CONTRACTS § 51, cmt. a (1981) ("[I]t is ordinarily essential to the acceptance of the offer that the offeree must know of the proposal made.").

The Iowa Supreme Court reasoned that a deviation from this traditional rule was

---

4. Under Iowa law, employment handbook cases are analyzed under a unilateral contract theory, and the party seeking to prove the existence of a contract must show the following elements: "(1) [T]he document must be sufficiently definite in its terms to create an *offer;* (2) the document must be communicat-ed to and accepted by the employee so as to create *acceptance;* and (3) the employee must continue working, so as to provide *consideration.*" *Taggart v. Drake Univ.,* 549 N.W.2d 796, 800 (Iowa 1996) (emphasis in original) (citing *McBride v. City of Sioux City,* 444 N.W.2d 85, 91 (Iowa 1989)).

justified because "[w]here a contract is based upon an employee handbook distributed to all employees, the contract is not an individually negotiated agreement; it is a standardized agreement between the employer and a class of employees." *Id.* at 284 (citing Mark Pettit, Jr., *Modern Unilateral Contracts*, 63 B.U.L.Rev. 551, 583 (1983)). While at first blush this reasoning might appear to translate into the realm of arbitration agreements in general, the court insisted that its holding was limited in scope to contracts allegedly formed by employee handbooks, because "[e]mployee handbook cases arise in a unique setting that implicates policies and concerns not entirely similar to the typical standardized agreement situation." *Id.* at 284 n. 5 (citing Michael A. Chagares, *Utilization of the Disclaimer as an Effective Means to Define the Employment Relationship*, 17 HOFSTRA L.REV. 365, 379 (1989)). Consequently, the Iowa court "decline[d] to follow the traditional requirement that knowledge of the offer is a prerequisite to acceptance *in the limited context of employee handbook cases.*" *Id.* at 284 (emphasis in original).

Furthermore, basic unilateral contract law principles are fundamental to the Iowa court's analyses of employee handbook cases. "A unilateral contract consists of an offeror making a promise and an offeree rendering some performance as acceptance." *Anderson*, 540 N.W.2d at 283. In contrast, a bilateral contract is a mutual exchange of promises. Samual Williston, WILLISTON ON CONTRACTS § 1:17, at 41 (Richard A. Lord, 4th ed.1990). Bilateral and unilateral contracts can be distinguished as follows:

> Traditional contract doctrine has distinguished between those contracts where each party promises some performance and those where only one party promises performance, and consideration from the promisee being actually given and being something other than a promise. The former contracts are called bilateral, the latter unilateral....: [E]ven the drafters of the Restatement (Second) recognize that some promises by their terms clearly seek a performance rather than a return promise; and the contract thus formed is therefore clearly promissory only on one side, and hence unilateral. While it is true, therefore, that in some cases a promise may not readily be characterized as clearly bilateral or clearly unilateral, either because it shares components of each or because it is subject to the frailties of human language, it nevertheless remains worthwhile to classify contracts in accordance with what the promisor is seeking from the promisee when he make[s] his promise.

*Id.* § 1:17, at 41–42. More succinctly put, unilateral and bilateral contracts differ in that the offeror of a unilateral contract seeks performance in exchange for a promise, while the offeror of a bilateral contract seeks a return promise. *Id.* The Alabama Supreme Court recently explained the distinction as follows:

> "[A] unilateral contract results from an exchange of a promise for an act; a bilateral contract results from an exchange of promises." Mark Pettit, Jr., *Modern Unilateral Contracts*, 63 B.U.L.Rev. 551, 553 (1983). Thus, "in a unilateral contract, there is no bargaining process or exchange of promises by parties as in a bilateral contract." *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 720 n. 11 (Ind.1997). "[O]nly one party makes an offer (or promise) which invites performance by another, and performance constitutes both acceptance of that offer and consideration." *Id.* Because "a 'unilateral contract' is one in which no promisor receives promise as consideration for his promise," only one party is bound. *Johns v. Thomas H. Vaughn & Co.*, 34

Ala.App. 99, 101, 38 So.2d 19, 20 (1948). The difference is not one of semantics but of substance; it determines the rights and responsibilities of the parties, including the time and the conditions under which a cause of action accrues for a breach of the contract.

*SouthTrust Bank v. Williams,* 775 So.2d 184, 188 (Ala.2000).

In this case, the arbitration agreement contemplates a mutual exchange of promises and, therefore, is bilateral. Specifically, the agreement provides the following:

- *Neither the Company nor the Employee can sue the other* in any court over differences based on a Claim or Dispute arising out of or related to their employment, application for employment, personal injury, or termination of employment. Def.'s Ex. A (Preamble: Purpose of Plan) (emphasis added).

- "Claim," "Controversy," "Dispute" or "Difference" means any claim, controversy, dispute, disagreement, difference, contention, or grievance *which an Employee has with the Company or the Company has with an employee*

which could be made the basis of a lawsuit in State or Federal Court. Def.'s Ex. A (Art. 1.3) (emphasis added).

- *Both the Company and the Employee promise* to resolve Disputes according to the Plan, rather than through the courts, in consideration for the *other Party's like promise* and for the consideration of continued employment. Def.'s Ex. A (Art. 7.3).

Thus, the plain language of the agreement clearly envisions an exchange of promises, notwithstanding that the agreement also identifies continued employment as consideration and as acceptance. That is so because whether a contract is unilateral or bilateral is dependent upon what the offeror is seeking in exchange for its promise and not upon what the consideration for the promise is. *See* Williston, *supra*, § 1:17, at 42.

Furthermore, the court emphasizes that its conclusion that this arbitration agreement is bilateral finds its footing in the unambiguous language of the agreement itself and does not apply across-the-board to all arbitration agreements.[5] Here, Ex-

---

**5.** At the same time, the court recognizes that many courts have held that a mutual promise to arbitrate differences may, in fact, be necessary consideration to support an arbitration agreement, especially when the agreement disclaims any alteration of the at-will employment status of employees. *E.g., Hull v. Norcom, Inc.,* 750 F.2d 1547, 1550 (11th Cir. 1985) ("[T]he consideration exchanged for one party's promise to arbitrate must be the other party's promise to arbitrate at least some specified class of claims."); *Durkin v. Cigna Property & Cas. Corp.,* 942 F.Supp. 481, 488 (D.Kan.1996) (under Kansas law, mutuality of rights and remedies is at least a factor, if not a requirement, in determining consideration); *J.M. Davidson Inc. v. Webster,* 2001 WL 587037, *1–2, 49 S.W.3d 507 (Tex.Ct.App. 2001) ("Consideration for a promise, by either the employee of the employer in an at-will employment, cannot be dependent on a period of continued employment. Such a

promise would be illusory because ... the company could have fired [the employee] the very minute she signed the acknowledgment form."); *cf. Michalski v. Circuit City Stores, Inc.,* 177 F.3d 634 (7th Cir.1999) (holding mutual promise to arbitrate sufficient consideration); *Johnson v. Circuit City Stores, Inc.,* 148 F.3d 373, 377 (4th Cir.1998) (employer's agreement to be bound by the arbitration process sufficient consideration even if employer not required to submit all of its claims for arbitration), *cert. denied,* 530 U.S. 1276, 120 S.Ct. 2744, 147 L.Ed.2d 1008 (2000); *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.,* 372 F.2d 753, 758 (2d Cir.1967) ("Hellenic's promise to arbitrate was sufficient consideration to support Dreyfus's promise to arbitrate."); *Lacheney v. ProfitKey Int'l, Inc.,* 818 F.Supp. 922 (E.D.Va.1993) (enforcing arbitration agreement and concluding that mutual promise to arbitrate was sufficient consideration) (citing *Hellenic Lines,* 372 F.2d at 758).

cel seeks its employees' promise to arbitrate their differences. The benefit Excel intends to reap from this agreement is the perceived increased efficiency and decreased costs associated with arbitration, not the continued employment of its incumbent employees.[6] In exchange for this promise, Excel likewise promises to arbitrate any differences it has with its employees. While in practice this promise may be illusory, it would prevent Excel from suing an employee who, for example, steals equipment from the plant or embezzles funds from the company. Accordingly, the court rejects as inapplicable the Iowa Supreme Court's employee handbook analysis of unilateral contracts.

Because the arbitration agreement here is bilateral, the court will employ ordinary principles of traditional contract law to determine its validity. *Cf. Kaplan,* 514 U.S. at 944, 115 S.Ct. 1920 (citing *Mastrobuono,* 514 U.S. at 62–63 & n. 9, 115 S.Ct. 1212; G. Wilner; 1 Domke on Commercial Arbitration § 4:04, at 15 (Rev. ed. Supp. 1993)); *accord AgGrow Oils,* 242 F.3d at 780 (applying North Dakota contract law

to determine whether incorporation clause included arbitration provision); *Lyster,* 239 F.3d at 946 ("State contract law governs whether an arbitration agreement is valid."); *Keymer,* 169 F.3d at 504 (same). Again, under Iowa law, "the essential elements of a contract include communication of an offer and acceptance in a manner specified or required by law." *Desy v. Rhue,* 462 N.W.2d 742, 746 (Iowa Ct.App. 1990); *accord Heartland Express, Inc. v. Terry,* 631 N.W.2d 260, 268 (Iowa 2001) (" 'All contracts must contain mutual assent; mode of assent is termed offer and acceptance.' ") (quoting *Anderson,* 540 N.W.2d at 285); *Magnusson Agency v. Public Entity Nat'l Company–Midwest,* 560 N.W.2d 20, 26 (Iowa 1997) ("All contracts must contain mutual assent[, and t]his assent is usually given through an offer and acceptance.") (citing *Anderson,* 540 N.W.2d at 285); RESTATEMENT (SECOND) OF CONTRACTS § 22 (1981) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.").

*But see Quigley v. KPMG Peat Marwick L.L.P.,* 330 N.J.Super. 252, 749 A.2d 405, 413 (2000) (employee's continued at-will employment was sufficient consideration to support arbitration agreement); *Ex Parte McNaughton,* 728 So.2d 592, 597 (Ala.1998) (under Alabama law, continued at-will employment sufficient consideration even when employer reserved right to amend arbitration agreement at any time).

**6.** The Iowa Supreme Court has explained the bargain in employee handbook cases as follows:

In exchange for the employer's guarantee not to discharge in the absence of cause or certain specified conditions, the employer reaps the benefits of a more secure and presumably more productive work force. *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 680, 765 P.2d 373, 387, 254 Cal.Rptr. 211, 225 (1988). The consideration for the bargain arises from the employee remain-

ing on the job, given that she would otherwise be free to leave at any time. *See Crain Indus., Inc. v. Cass,* 305 Ark. 566, 810 S.W.2d 910, 914 (1991); Note, *Protecting At–Will Employees* 93 Harv.L.Rev. 1816, 1819–20 (1980).

*Hunter v. Board of Trustees of Broadlawns Med. Ctr.,* 481 N.W.2d 510, 513–14 (Iowa 1992); *cf. Van Hosen v. Bankers Trust Co.,* 200 N.W.2d 504, 505 (Iowa 1972) (recognizing employers realize benefit in offering employees pension plans sufficient to support bargain).

In the instance of this arbitration agreement, the DRP specifically states that its acceptance does not alter the at-will employment status of Excel employees. Def.'s Ex. A (Art. 7.10). Therefore, that identified aspect of the bargain is absent, because the employee presumably remains free to leave the workplace, while Excel remains free to discharge employees for any lawful reason. The remaining benefit can only be viewed as the exchange of promises to arbitrate grievances.

The court will address each of these elements in turn.

### 3. Offer

Owen claims that the terms of the DRP are too indefinite to be a valid offer under Iowa law. Traditional contract theory defines an offer as a " 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " [7] *Anderson,* 540 N.W.2d at 285 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981)); *accord Fosson v. Palace (Waterland), Ltd.,* 78 F.3d 1448, 1452 (9th Cir. 1996) (citing RESTATEMENT (SECOND) OF CONTRACTS § 24); *Bourque v. F.D.I.C.,* 42 F.3d 704, 708 (1st Cir.1994) (citing RESTATEMENT (SECOND) OF CONTRACTS § 24); *Day v. Amax, Inc.,* 701 F.2d 1258, 1263 (8th Cir.1983) (citing RESTATEMENT (SECOND) OF CONTRACTS § 24); *Magnusson Agency v. Public Entity Nat'l Co.–Midwest,* 560 N.W.2d 20, 26 (Iowa 1997) (quoting *Anderson,* 540 N.W.2d at 285, which in turn quotes RESTATEMENT (SECOND) OF CONTRACTS § 24). Iowa courts "look for the existence of an offer objectively—not subjectively." *Anderson,* 540 N.W.2d at 285 (citing *LaFontaine v. Developers & Builders, Inc.,* 261 Iowa 1177, 1183, 156 N.W.2d 651, 655 (1968), which held that existence of contract determined from words and circumstances); *accord Phipps,* 558 N.W.2d at 203 ("In conducting our objective inquiry, we look for terms with precise meaning that provide certainty of performance. If an offer is indefinite, there is no intent to be bound.") (citing *Anderson,* 540 N.W.2d at 285–286).

In *Anderson,* the Iowa Supreme Court addressed the issue of unilateral contracts created by employee handbooks provided to employees. *Anderson,* 540 N.W.2d at 277. In *Anderson,* the employer argued, *inter alia,* that the handbook in question was not an offer. *Id.* at 286. The court employed traditional contract theory and stated that, to be effective, an offer must be sufficiently definite in its terms. *Id.* This rule is premised on the understanding that, " '[a] contract has, strictly speaking, nothing to do with the personal, or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent.' " *Id.* at 285 (quoting *Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911) (Learned Hand, J.), *aff'd sub nom. Ernst v. Mechanics' & Metals Nat'l Bank,* 201 F. 664 (2d Cir.1912), *aff'd nom. National City Bank v. Hotchkiss,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)). For that reason, Iowa courts "look for terms with precise meaning that provide certainty of performance. This is a definiteness inquiry: if an offer is indefinite there is no intent to be bound." *Id.* (internal citations omitted); *accord Palmer v. Albert,* 310 N.W.2d

---

7. While the court has concluded that the employee handbook unilateral contract analysis does not apply to this arbitration agreement, the *Anderson* court confined its alteration of the traditional rule of contract law to holding that it is "unnecessary that the particular employee seeking to enforce a promise made in an employee manual have knowledge of the promise." *Anderson,* 540 N.W.2d at 285. In all other respects, the Iowa Supreme Court's analysis of offer is in accordance with traditional contract theory. *See id.* at 285 ("We now consider whether ... the handbook constituted an offer to Anderson to utilize progressive disciplinary procedures. We believe this aspect of the analysis should be conducted according to traditional contract theory."). Thus, the *Anderson* court's analysis of general contract law principles is applicable to this arbitration agreement. Therefore, this court's reliance on *Anderson* and on other Iowa Supreme Court cases, which in turn rely on *Anderson,* is not inconsistent with its conclusion that the unilateral employee handbook analysis is inapposite to this case.

169, 172 (Iowa 1981) ("We have a number of cases supporting the principle that a contract must be definite and certain in order to be given legal effect.") (citing *Davis v. Davis*, 261 Iowa 992, 1001, 156 N.W.2d 870, 876 (1968); *Lewis v. Minnesota Mut. Life Ins. Co.*, 240 Iowa 1249, 1258, 37 N.W.2d 316, 321 (1949); *Gould v. Gunn*, 161 Iowa 155, 164, 140 N.W. 380, 384 (1913); *Faulkner v. Des Moines Drug Co.*, 117 Iowa 120, 122, 90 N.W. 585, 586 (1902)).

To guide its definiteness inquiry, the court identified three factors: (1) whether the provisions contained in the handbook were merely a statement of policy or, rather, were directives; (2) whether the language was "detailed and definite or general and vague"; and (3) whether "the employer ha[d] the power to alter the [terms] at will." *Id.* Outside the context of employee handbook cases, the Iowa Supreme Court has cautioned against carrying the definiteness inquiry to extremes:

> In *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 420 (Iowa 1977), we said: "(Contract) terms are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance." Restatement (Second) of Contracts § 32(2) (Tent. drafts Nos. 1–7) (1973) states the rule this way: "The terms of a contract are reasonably certain if they provide a basis for determining existence of a breach and for giving an appropriate remedy."

*Palmer*, 310 N.W.2d at 172.

The Iowa court found in *Anderson* that no contract existed between the parties, but not on the ground of indefiniteness. *See Anderson*, 540 N.W.2d at 286–87 ("We need not decide whether these factors alone result in a sufficiently definite offer, however, because we must also consider the effect of [the] disclaimer."). Instead, the court held that a disclaimer prevented the formation of a contract by clarifying the employer's intent of not entering into a contract. *Id.* at 287–88.

■ Applying the test of definiteness identified in *Anderson*, the court finds the terms of the DRP are sufficiently definite to constitute an offer. "When considering whether a handbook [or other document] is objectively definite to create a contract [Iowa courts] consider [the] language and context." *Id.* at 286. The text of the DRP uses mandatory language, which clearly indicates that its terms are a directive and are not merely a policy statement. For example, Article 2 states, "This Plan spells out the only way to deal with any and all disputes or differences between the Company and its Employees...." Def.'s Ex. A (Art. 2.1). Further, Articles 4 and 6 outline the *"Mandatory Steps"* to process a complaint and imposes a thirty or sixty day limitation, depending upon the circumstances, on how long the Review Committee has to respond to an employee's appeal. Def.'s Ex. A (Arts.4.4, 6.2) (emphasis added). Further, the arbitration provision itself provides that "[i]f Mediation does not work, the Company and the Employee agree that the Dispute or Difference *shall* be arbitrated." Def.'s Ex. 1 (Art. 5.2) (emphasis added). "Shall" is commonly recognized as indicating a directive. Black's Law Dictionary states:

> As used in contracts ..., this word is generally imperative or mandatory. In common or ordinary parlance, and in its ordinary signification, the term "shall" is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation. It has the invariable significance of excluding the idea of discretion, and has the significance of operating to impose a duty....

Black's Law Dictionary 1375 (6th ed.1990).

Nevertheless, Owen contends that the DRP is so misleading that any otherwise

definite terms are rendered too vague to constitute an offer. However, Owen does no more than offer a conclusory statement that the terms are confusing without specifying any terms alleged to be inconsistent or vague. The court finds that some duties are undeniably imposed by the DRP, and any arguably confusing terms will not negate the definiteness of the otherwise clear duties. Moreover, the DRP explicitly cites the FAA and states, "This plan is an arbitration agreement." Def.'s Ex. A (Art. 7.5). In addition, the DRP acknowledges the mutual obligations of the parties: "Both the Company and the Employee promise to resolve Disputes according to the Plan, rather than through the courts, in consideration for the other Party's like promise and for the consideration of continued employment." Def.'s Ex. 1 (Art. 7.3). Thus, the very language of the plan sets out specific duties applicable to both parties and underscores these duties with a recognition that they are binding on both parties. *Cf. Jones*, 569 N.W.2d at 375 (holding that handbook stating it was "to be regarded as binding on both the employee and management" contained sufficiently definite language to find the existence of an implied contract).

In addition, the procedures and duties of the DRP are fairly specific. As discussed above, the DRP sets out a mandatory procedure by which to process complaints, charts a time-line applicable to this process, and, furthermore, establishes a mechanism to choose arbitrators. Def.'s Ex. A. What is more, unlike the employee hand-

book cases in which the documents in question did not purport to be anything more than handbooks, as noted above, Article 7.3 of the DRP explicitly states that Excel intends to be bound by the terms of the plan. This intent to be bound also distinguishes the DRP from cases such as *Anderson*, in which the Iowa Supreme Court ruled that a disclaimer contained in the employee handbook prevented the formation of a contract. *See Anderson*, 540 N.W.2d at 287–88. The arbitration agreement here contains no such disclaimer and, again, expressly evinces Excel's intent to be bound by the terms of the plan.

And finally, while it is true that the DRP reserves in Excel the power to amend and discontinue the Plan, this power is not the "Achilles heel" that Owen contends it to be. Def.'s Ex. A (Art. 7.6). The Iowa Supreme Court has stated that "[m]erely reserving the right to change the provisions [of a unilateral employment contract] is not sufficient to defeat the creation of an implied contract." *Jones v. Lake Park*, 569 N.W.2d 369, 376 (Iowa 1997). This result is logical in light of the fact that an employer's power to alter the procedures at will is but one factor in the court's determination of definiteness. *See Anderson*, 540 N.W.2d at 286. In this case, when viewed in the context of the other provisions, which are decidedly mandatory and binding, Excel's ability to amend or discontinue the Plan does not defeat the otherwise clear and definite terms of the Plan.[8] Furthermore, it is doubtful that Iowa courts would require

---

8. Owen also argues that while employees can enforce unilateral employment contracts against employers, employers cannot enforce unilateral contracts against employees. This contention is based on Owen's inability to find any reported Iowa cases in which the employer has sought to enforce an agreement against an employee. While an interesting and creative argument, the court is unable to discern any reason why the legal analysis should depend upon the identity of the party. Furthermore, the very statement that "the

party who seeks recovery on the basis of a unilateral contract has the burden to prove the existence of a contract" implies that either party to a unilateral contract can enforce it. *See Anderson*, 540 N.W.2d at 283. The court's rejection of this argument is in part guided by the observation that the force of the FAA would be crippled if employers were not able to enforce arbitration agreements against their employees; the FAA does not distinguish between who can enforce agreements against

the same level of definiteness of an offer in the context of a bilateral contract than is required of offers to enter into unilateral contracts. However, because this court finds that the terms of the DRP are sufficiently definite, the court need to reach that issue.

■ While valid offers require definite terms, even a valid offer is not effective until it reaches the offeree. *See Anderson,* 540 N.W.2d at 283 (describing traditional offer analysis as "offeree must know of the offer before there can be mutual assent") (citing *Caldwell v. Cline,* 109 W.Va. 553, 156 S.E. 55, 56 (1930), and Farnsworth, § 3.10, at 212, which stated "This requirement has been reinforced by the insistence of the bargain theory of consideration that the acceptance be made in response to the offer."); *accord Desy,* 462 N.W.2d at 746 (Iowa Ct.App.1990) (one essential element of contract includes communication of offer); RESTATEMENT (SECOND) OF CONTRACTS § 23 ("It is essential to a bargain that each party manifest assent with reference to the manifestation of the other."); Williston, *supra,* § 4:13, at 365–67 ("As a general principle, an offeree cannot actually assent to an offer unless he knows of its existence.... In short, in order for an offer to

exist, it must constitute a manifestation communicated to the offeree so as to justify his understanding that by assenting a bargain will be concluded."). In the parlance of contract law, communication of the offer is a prerequisite to the parties reaching a "meeting of the minds." *See* RESTATEMENT (SECOND) OF CONTRACTS § 17, cmt. c (requiring a bargain in which there is a manifestation of mutual assent, which is often referred to as a "meeting of the minds"). Thus, even though the DRP is sufficiently definite to constitute an offer within the meaning of Iowa contract law, Excel must also have communicated the terms of the offer to Owen before there can be mutual assent. *See Desy,* 462 N.W.2d at 746.

On this point, the issues of whether Excel communicated the terms of the DRP to Owen and whether Owen's continued employment was a manifestation of his assent to the terms of the DRP converge, and the court's analysis of these claims will necessarily overlap. Nevertheless, Excel bears the burden of proving communication and acceptance of the DRP because under the *Erie* doctrine, federal courts sitting in diversity apply the forum state's law concerning burdens of proof.[9] *See, e.g.,*

whom—each party can compel the other to abide by the terms of their agreement. *See* 9 U.S.C. §§ 3–4; *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir.1971) (under provision of Federal Arbitration Act authorizing district court to stay proceedings "on application of one of the parties" term "party" denotes either party to suit or party to arbitration provision); *cf. Gannon v. Circuit City Stores, Inc.,* 262 F.3d 677 (8th Cir.2001) (employer enforcing arbitration agreement against employee); *Taylor v. Southwestern Bell Telephone Co.,* 251 F.3d 735 (8th Cir.2001) (same). And finally, because unilateral contracts, by definition, are promissory only on one side and, therefore, only one party is bound, it is clear why Owen was unable to unearth any cases in which the employer sought to enforce the provisions of a handbook against an employee. *See SouthTrust Bank,* 775 So.2d at 188.

9. The Third Circuit Court of Appeals has held that the district court, when considering a motion to compel arbitration that is opposed on the ground that no agreement to arbitrate was made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise. *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 (3d Cir.1980). Subsequent courts have analogized this standard to the summary judgment standard:

> [The party seeking to compel arbitration] bears an initial summary-judgment-like burden of establishing that it is entitled to arbitration. *See, e.g., Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 n. 9 (3d Cir.1980) (standard on motion to compel arbitration is same as summary judgment standard); *Doctor's Assoc., Inc. v. Distajo,* 944 F.Supp. 1010, 1014 (D.Conn.

*Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1122 (8th Cir.1985) ("Questions such as burden of proof, presumptions, competency, and privileges are generally questions of state law...."); *accord United States v. McCombs,* 30 F.3d 310, 323–24 (2d Cir.1994) (holding that, under the *Erie* doctrine, federal courts sitting in diversity apply the forum state's law concerning burdens of proof); *cf. Jolley v. Welch,* 904 F.2d 988, 993 (5th Cir.1990) (stating party seeking to compel arbitration has burden to prove existence of valid agreement). In Iowa, this burden rests with "the party who seeks recovery on the basis of a ... contract." *See Phipps,* 558 N.W.2d at 203 (citing *Anderson,* 540 N.W.2d at 283); *accord Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.,* 606 N.W.2d 370, 373 (Iowa 2000) ("It is fundamental to our legal system that the burden of proof in an action ordinarily rests with the party who is seeking recovery.") (citing *Verschoor v. Miller,* 259 Iowa 170, 175, 143 N.W.2d 385, 388 (1966), and Iowa R.App.P. 14(f)(5)); *North v. State,* 400 N.W.2d 566, 568 (Iowa 1987) (stating that the party seeking to enforce a contract "ha[s] the burden of proving all elements of her contract action, including the existence of an enforceable express contract"); *Hawkeye Land Co. v. Iowa Power & Light Co.,* 497 N.W.2d 480, 486 (Iowa Ct.App.1993) ("A party who seeks recovery on a contract has burden to prove the existence of a contract.") (citing *Roland A. Wilson & As-*

*socs. v. Forty–O–Four Grand Corp.,* 246 N.W.2d 922, 925 (Iowa 1976)).

Excel seeks to carry this burden by way of two affidavits. The first affidavit submits that "The Dispute Resolution Plan was communicated to all employees to whom the plan applied through various means, including Larry Owen, through: (1) mailings to employee home addresses; (2) employee sessions at the facilities; and (3) notification in the employee handbook on the Company's internal website." Bright Aff. ¶ 13 (May 29, 2001). The affiant, Gary Bright, is the Assistant Vice President of Human Resources for Excel Corporation and works at Excel's headquarters in Witchita, Kansas. There is no indication that he has any first-hand knowledge regarding the actual distribution of the DRP to Excel employees. Furthermore, in his May 29, 2001 affidavit, the Plan to which Mr. Bright was referring was the Plan that Excel initially submitted, which applied only to Texas employees. Bright Aff. ¶ 11 ("A copy of the Plan is attached to this Affidavit."). Other than Mr. Bright's assertion that he mailed a copy of the Texas Plan to employees' residences, there is no evidence in the record that the employees received a copy of the Plan. Moreover, Excel was not able to produce any records or verification that the Plan was sent, that Excel made any effort to ensure that employees received it, nor even that Excel maintained current mailing addresses for its employees.

---

1996), *aff'd,* 107 F.3d 126 (2d Cir.1997) (same); *Dougherty v. Mieczkowski,* 661 F.Supp. 267, 270 n. 1 (D.Del.1987). Thus, [the movant] must present evidence sufficient to demonstrate the existence of an enforceable agreement to arbitrate. *See, e.g., Oppenheimer & Co. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir.1995). If [the movant] makes such a showing, the burden shifts to plaintiff to submit evidence demonstrating a genuine issue for trial. *Id.; see also Naddy v. Piper Jaffray, Inc.,* 88 Wash.

App. 1033, 1997 WL 749261, * 2, (Wash. App. Dec. 4, 1997).

*Klocek v. Gateway, Inc.,* 104 F.Supp.2d 1332, 1336 (D.Kan.2000).

Thus, there are two possible standards to apply to this case. Regardless of this court's choice, however, the burden of establishing the existence of a valid agreement to arbitrate rests with Excel, because Excel is the party seeking to compel arbitration and, therefore, is also the party relying on the existence of a contract.

While such records are not required, had Excel produced this evidence, it may have carried its burden of proof. This fact is illustrated by the rarity of cases in which the making of an arbitration agreement is actually at issue. It appears from the reported decisions that virtually all employers require signed contracts or acknowledgment forms. *See, e.g., Brown v. Wheat First Securities, Inc.,* 257 F.3d 821 (D.C.Cir.2001) (signed "Uniform Application for Securities Industry Registration or Transfer," commonly known as Form U–4, which includes mandatory arbitration clause); *Montez v. Prudential Sec., Inc.,* 260 F.3d 980, 982 (8th Cir.2001) (same); *Penn v. Ryan's Family Steak Houses, Inc.,* 269 F.3d 753 (7th Cir.2001) (signed arbitration agreement with dispute resolutions service provider, which recognized employer as third-party beneficiary and was condition of employment) and noting that ("employers are increasingly requiring employees to sign contracts obligating them to arbitrate disputes as a condition of employment") (page numbers not available); *MicroStrategy, Inc. v. Lauricia,* 268 F.3d 244 (4th Cir.2001) (signed "Employee Acknowledgment Form and Agreement to Arbitrate"); *Gannon,* 262 F.3d at 679 (Dispute Resolution Agreement signed by employee); *EEOC v. Gaffney,* 2001 WL 1338368, *1 (N.D.Tex. Oct. 16, 2001) (signed arbitration agreement agreeing to arbitrate employment disputes); *Gardner v. Ryan's,* 2001 WL 1352113, *1 (W.D.Va. Oct. 31, 2001) (signed arbitration agreement as part of employment application process); *Neal v. Lanier Professional Servs.,* 2001 WL 1335860, *2 (N.D.Tex. Oct. 24, 2001 ) (signed employment agreement containing arbitration provision); *McAlindon v. Clio Golf Course, Inc.,* 2001 WL 1404706, *1 (Mich.Ct.App. Nov. 9, 2001) (per curiam) (slip op.) (affirming grant of motion for summary judgment on ground signed handbook including arbitration provision precluded judicial review of retaliation claim). Such practices would have considerably strengthened Excel's case, because a signed agreement would have given rise to a presumption of validity. The calculus changes significantly when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration. Under these circumstances, there is no presumption of validity that would trigger the court's duty to compel arbitration. *See Chastain v. Robinson–Humphrey Co.,* 957 F.2d 851, 854 (11th Cir.1992).

There is no persuasive evidence that Excel mailed the DRP to Owen, and there is absolutely no evidence that (1) Owen received the DRP; (2) employees knew of the availability of the DRP on the company's website; or (3) employees had access to computers. On the record before the court, the only evidence of communication of the Plan is Curtis Bryant's affidavit. Mr. Bryant is the Executive Vice–President of DSI and was charged with presenting the DRP to Excel employees at the Orange City facility. He states that "During the training sessions, I distributed a summary of the Dispute Resolution Plan and played a videotape for the employees in attendance which explained the Plan, how it works, and the employees' rights." Bryant Aff. ¶ 5. In addition, he asserts that "Following the videotape presentation, I further discussed the Plan with the employees in attendance and answered any questions." Bryant Aff. ¶ 6. Mr. Bryant did not state, nor does Excel contend, that the Plan in its entirety was distributed to the employees at these training sessions; instead, Excel asserts only that a summary of the Plan was presented. Owen admits attending the training session conducted by Mr. Bryant but does not recall receiving a hard copy of a summary of the Plan. Moreover, Excel was unable to produce a copy of the summary, even though it contends the summary was distributed. Fur-

thermore, Excel has not even attempted to explain what was contained in the summary. The Iowa courts' position that the burden of proof normally rests with the party who has the greater access to the proof supports this court's conclusion that Excel has failed to meet its burden. *See, e.g., Shell Oil Co.,* 606 N.W.2d at 373 (citing *In re Mt. Pleasant Bank & Trust Co.,* 455 N.W.2d 680, 685 (Iowa 1990), and *Haynes v. Dairyland Mut. Ins. Co.,* 199 N.W.2d 83, 85 (Iowa 1972)).

Even assuming without deciding that a summary of the arbitration agreement would have sufficed as adequate communication of the offer and further assuming that the summary was distributed, the court is unable to find on this record that the material terms of the Plan were communicated to Owen. Nothing in the record supports a contrary conclusion. Further, although Mr. Bryant states that he explained how the Plan works and employees' rights under the Plan, he did not assert that other material terms were discussed, such as the fact Excel would deem continued employment to constitute acceptance. Without viewing the summary allegedly distributed to Excel employees, and without any testimony regarding the specifics of Mr. Bryant's presentation, the court cannot find that Excel has borne its burden of proof.

The court further recognizes that actual knowledge of the terms of an offer are not essential to the formation of a contract. *Cf. Bryant v. American Exp. Fin. Advisors, Inc.,* 595 N.W.2d 482, 486–87 (Iowa 1999) (failure to read contract that was incorporated by reference in arbitration agreement did not prevent formation of contract to arbitrate disputes). In this regard, the Iowa Supreme Court stated:

> An agreement to arbitrate is to be treated like any other contract, *Gilmer,* 500 U.S. at 24, 111 S.Ct. at 1651, 114 L.Ed.2d at 36, and a failure to fully read and consider the contract cannot relieve him of its provisions. This rule applies to contracts, such as the present one, that incorporate documents by reference. Failure to read a contract before signing it will not, as a rule, affect its binding force. Indeed, the courts appear to be unanimous in holding that a person who, having the capacity and an opportunity to read a contract, is not misled as to its contents and who sustains no confidential relationship to the other party cannot avoid the contract on the ground of mistake if he signs it without reading it, at least in the absence of special circumstances excusing his failure to read it.

*Id.; accord Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92, 99 (Iowa 1995) ("A party is charged with notice of the terms and conditions in a contract he or she entered into if the party is able to read the contract and has the opportunity to read it."), *rev'd on other grounds, Hamm v. Allied Mut. Ins. Co.,* 612 N.W.2d 775 (Iowa 2000); *Preston v. Howell,* 219 Iowa 230, 257 N.W. 415, 418 (Iowa 1934) ("It is also the settled rule of law that if a party to a contract is able to read, has the opportunity to do so, and fails to read the contract, he cannot thereafter be heard to say that he was ignorant of its terms and conditions, for the purpose of relieving himself from its obligation."). However, this rule that a party's failure to read an agreement will not prevent the formation of a contract assumes that the party seeking to avoid enforcement had the opportunity to read the contract. *E.g., Kartheiser v. American Nat'l Can,* 84 F.Supp.2d 1008, 1015 (S.D.Iowa 1999) (applying Iowa law and finding no offer due to employer's failure to distribute subsequent manual to employees). Applying Iowa law, the district court found that an employer's failure to distribute a disclaimer was fatal to its

claim that the disclaimer superseded the previously distributed manual:

American Can cites *Anderson*, which states that it is "unnecessary that the particular employee seeking to enforce a promise made in an employee manual have knowledge of the promise," for the proposition that Kartheiser did not have to know about the disclaimer to be affected by it. *See* 540 N.W.2d at 285. It is certainly the law in Iowa that where a handbook is actually distributed to employees, a given employee need not have actual knowledge of a policy or disclaimer to enforce it or have it enforced against him or her. *See id.* at 284. Here, however, Kartheiser correctly points out that there was no distribution of the H.R. Manual to him or other employees, and American Can does not claim that it otherwise communicated the disclaimer to him. Thus, the quoted holding from *Anderson* does not apply. *See id.* at 284–85; *see also* *McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989) ("Claims under unilateral contract theory frequently break down because ... there is no acceptance because the disciplinary provisions are never communicated to the employee") (citing *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919, 923 (1987) (no unilateral contract where employment policies not communicated to employee) & *Hoffman–La Roche, Inc. v. Campbell*, 512 So.2d 725, 734 (Ala.1987) ("[i]t is axiomatic that an offer must be communicated before it may be accepted")). Because the disclaimer was never distributed, actually or constructively, to Kartheiser, the Court is thus unable to apply the Anderson disclaimer analysis. *Id.*

In this case, the court has found that Excel, like American Can, failed to demonstrate distribution of the DRP. Consequently, the rule that knowledge of terms is not essential to the formation of a contract does not apply, because that rule is premised on the offeree having access to the offer but having negligently failed to read it. This court shares the *Kartheiser* court's concern regarding communication of terms of employment. In *Kartheiser*, the district court cautioned against a rule that would permit "employers ... to enforce the most oppressive policies and disclaimers against employees as long as they kept a copy of these policies and disclaimers hidden away somewhere in the bowels of the company's facility, never having distributed the handbook to employees." *Id.* This concern is heightened in cases such as this, in which employers impose arbitration agreements as a condition of employment, which waive the employees' statutorily guaranteed rights to a judicial forum.

### 4. Acceptance

Because the court finds that Excel did not communicate the terms of the DRP to Owen, the DRP does not constitute an effective offer under Iowa law. Accordingly, no contract could have resulted from Owen's continued employment, notwithstanding that the Plan identifies continued employment as acceptance. Def.'s Ex. A. (Art. 7.8). This is so because "an offeree cannot actually assent to an offer unless he knows of its existence." Williston, *supra*, § 4:13, at 365 (citing RESTATEMENT (SECOND) OF CONTRACTS § 23); *accord* E. Allen Farnsworth. *Contracts* § 3.15 (2d ed.1990) (unless the offeree has knowledge of the offer an offeror cannot "impose liability on the offeree that remains silent or continues in established ways"). Clearly, if Owen had no knowledge of the offer, no act of his can be deemed an acceptance, especially in light of the fact his employment was a mere continuation of established ways. In order for conduct, rather than words, to function as acceptance, a party's actions must be calculated to lead

the offeror to believe that the offer had been accepted. *Id.* Because there is absolutely no evidence in the record that Owen had knowledge of Excel's offer, the court likewise cannot find that Owen's continued employment was calculated to manifest his acceptance of the Plan.

Iowa courts have often looked to the approach taken by the drafters of the Restatement of Contracts for guidance in construing Iowa law. *See, e.g., Mincks Agri Center, Inc. v. Bell Farms*, 611 N.W.2d 270, 274–75 (Iowa 2000) (recognizing Iowa courts have looked to the Restatement for guidance and specifically adopting section 181); *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 48 (Iowa 1999) (utilizing section 90 of the Second Restatement of the Law of Contracts and recognizing Iowa courts' "historical reliance on the Restatement in our formulation of promissory estoppel"); *Midwest Dredging Co. v. McAninch Corp.*, 424 N.W.2d 216 (Iowa 1988) (adopting Restatement's approach of third-party standing). Section 19 of the Restatement (Second) of Contracts explains that "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." RESTATEMENT (SECOND) OF CONTRACTS § 19. The Restatement further provides that, when an offer invites acceptance through performance, performance ordinarily constitutes an acceptance. *Id.* § 53. However, "the meaning of non-verbal conduct is even more dependent on its setting than the meaning of words. The words or conduct of the offeree may show that he acts gratuitously, or otherwise without reference to the offer. There is then no bargain." *Id.* cmt. c (internal references omitted). The most obvious and simple example of this rule is unknown offers of rewards. In the comments to section 23 of the Restatement (Second) of Contracts, the drafters pro-

pose the following illustration: "A advertises that he will give a specified reward for certain information, or writes B a similar proposal. B gives the information in ignorance of the advertisement, or without having received the letter. There is no contract enforceable as a bargain." *Id.* § 23, cmt. c.

In this case, because the court finds that the evidence does not support Excel's contention that it communicated the DRP to its employees, no contract resulted from Owen's continued employment. Nevertheless, Excel argues that an implied contract resulted when Owen submitted a grievance to DSI in October of 1999. The court turns now to this inquiry.

### 5. *Implied Contract*

██ " 'When the parties manifest their agreement by words, the contract is said to be express. When it is manifested by *conduct*, it is said to be *implied in fact*. Both are true contracts formed by a mutual manifestation of assent by the parties to the same terms of the contract.' " *Irons v. Community State Bank*, 461 N.W.2d 849, 855 (Iowa Ct.App.1990) (quoting *Duhme v. Duhme*, 260 N.W.2d 415, 419 (Iowa 1977), and citing *Walz v. Buse*, 260 Iowa 353, 149 N.W.2d 149, 152–53 (1967); *Maasdam v. Maasdam's Estate*, 237 Iowa 877, 889–90, 24 N.W.2d 316, 322 (1946); RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981)); *accord Guldberg v. Greenfield*, 259 Iowa 873, 146 N.W.2d 298, 301 (Iowa 1966) ("A contract is express when the parties show their assent in words. A contract is implied in fact, commonly called an implied contract, when the parties show their assent by acts."). In the context of implied contracts, mutual assent is inferred from the conduct of the parties. *In re Newson's Estate*, 206 Iowa 514, 219 N.W. 305, 307 (Iowa 1928).

■ In this case, Owen admits attending the October 19, 1999 training session conducted by DSI. And while he does not recall receiving a copy of the DRP, he did receive a DSI business card, which included a telephone number to submit grievances. Because the court has found that Excel failed to communicate the DRP, the court likewise cannot assume that initiation of the grievance procedure amounts to an acceptance of the terms of the arbitration agreement. There is no indication in the record that Owen was aware that his conduct would preclude other avenues of relief. For example, Owen did not follow through with the grievance he submitted to DSI. Had he known of the terms of the DRP, he may not have ignored DSI's letter requesting further information. Nevertheless, the court need not speculate about Owen's motivation, because the burden to prove the existence of a contract is on Excel.

Here, Excel's only evidence of an implied contract is Owen's submission of his age complaint to DSI. What is more, Excel did not even brief this issue. The court finds that the evidence on the record is wholly lacking in terms of establishing mutual consent to arbitrate grievances.

A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intention in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract.

*Palmer,* 310 N.W.2d at 172 (citing 1 S. Williston, *A Treatise on the Law of Contracts* § 37 (3d ed. W. Jaeger 1957)).

In this case, the only conduct from which this court is urged to find mutual assent is Owen's innocuous act of placing a phone call to DSI and making a verbal complaint. Accordingly, the "mutual manifestation of assent" necessary to establish an implied-in-fact contract, *Duhme,* 260 N.W.2d at 419, is missing, and the court finds Owen's actions did not give rise to an implied contract to arbitrate.

In general, the acts which give rise to an implied contract are unambiguous. The issue of implied contracts arises most often in the contexts of unjust enrichment, indemnity, and mechanic's liens. In each of these instance, the party arguing the existence of an implied contract allegedly incurred some appreciable loss due to the other party's actions. *See, e.g., Frontier Properties Corp. v. Swanberg,* 488 N.W.2d 146, 150 (Iowa 1992) (holding that contractor proved implied contract with homeowner as to "extras" even though there was no agreement as to price; because homeowner requested contractor to furnish extras, law would imply a promise to pay reasonable compensation); *Guldberg v. Greenfield,* 259 Iowa 873, 146 N.W.2d 298, 304 (Iowa 1966) (implied contract exists when a party at the request of the owner performs work and material without an express agreement for compensation; the law implies a promise on the part of the owner to pay a reasonable compensation for the work and material). Here, there is no evidence that Owen knew the terms of the DRP. Consequently, his actions in placing a complaint do not manifest his mutual assent to any agreement.

### C. Who Determines Arbitrability?

■ At oral argument, Excel urged this court to refer the question of the validity of the DRP to an arbitrator pursu-

ant to the plain language of the agreement itself. The Federal Arbitration Act governs the question of who must decide issues of arbitrability. Under the Act, a district court must compel arbitration if the parties have agreed to arbitrate their dispute. 9 U.S.C. §§ 2–3. However, if the validity of the agreement to arbitrate is in issue, a district court, not a panel of arbitrators, must decide if the arbitration clause is enforceable against the parties. *Id.* § 4; *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that if the making: of the arbitration agreement is an issue "the federal court may proceed to adjudicate it"). Simply put, parties cannot be forced to submit to arbitration if they have not agreed to do so. *Volt Info. Sciences*, 489 U.S. at 478, 109 S.Ct. 1248. Thus, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

The Eighth Circuit Court of Appeals has recognized that "a clear and unmistakable delegation of the question of arbitrability" suffices to take the question of arbitrability away from the court in the first instance. *Lebanon Chem. Corp. v. United Farmers, Plant Food, Inc.*, 179 F.3d 1095, 1100 (8th Cir.1999) (citing *Kaplan*, 514 U.S. at 944, 115 S.Ct. 1920). In *Lebanon Chemical*, however, the court held that the language of the agreement was too general to amount to an express delegation of the issue of arbitrability. *Id.* Accordingly, the district court properly determined the question of validity. *Id.* In this case, the language of the DRP is more specific than the language of the *Lebanon Chemical* agreement. In *Lebanon Chemical*, the agreement provided that " '[A]ll differences which cannot be amicably resolved ... arising from a contract started or con-

cluded under these Rules, shall first be decided by arbitration before it can be submitted to a court of law.' " *Id.* Conversely, the DRP specifically provides for the arbitration of the question of arbitrability: "Any question or dispute concerning how the Plan is formed, applied, interpreted, enforced, or whether the Plan is valid, reworkable, fair, or its extent, shall be subject to Arbitration as provided by the Plan." Def.'s Ex. A (Art. 7.4(a)).

Nevertheless, arbitration is a creature of contract, and parties cannot be forced to arbitrate any matter they did not agree to arbitrate. *Kaplan*, 514 U.S. at 943, 115 S.Ct. 1920. While the Supreme Court and the Eighth Circuit have recognized the ability of parties to contractually agree to arbitrate the question of arbitrability, this case differs significantly from those cases in which courts have compelled arbitration without first determining whether the parties had entered into a valid agreement to arbitrate. *Cf. id.* (requiring clear and unmistakable delegation of arbitrability); *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 583 n. 7, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (recognizing possibility of delegating question of arbitrability to the arbitrator); *St. Paul Fire and Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624–25 (8th Cir.2001) ("In deciding whether to compel arbitration, a district court must determine whether the dispute is arbitrable, that is, within the scope of the agreement to arbitrate, unless the parties have clearly agreed to leave that issue to the arbitrator."); *Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 431 (8th Cir.1998) (requiring clear and unmistakable delegation of question of arbitrability); *McLaughlin Gormley King Co. v. Terminix Int'l Co.*, 105 F.3d 1192, 1193–94 (8th Cir.1997) (same). In those cases, the making of an agreement to arbitrate was not at issue, and there was at least a

presumption of validity based on a signed agreement. *See Kaplan*, 514 U.S. at 941, 115 S.Ct. 1920 ("MKI, having signed the only workout document (out of four) that contained an arbitration clause, accepted arbitration."); *Warrior & Gulf*, 363 U.S. at 574, 80 S.Ct. 1347 (addressing signed collective bargaining agreement between union and employer); *Courtney Enters., Inc.*, 270 F.3d 621, 623–24 (arguing Claims Service Agreement between insurer and insured invalid under Texas insurance laws); *Telectronics Pacing*, 143 F.3d at 431–32 (finding clear and unmistakable delegation of question of arbitrability contained in patent licensing agreement); *Terminix*, 105 F.3d at 1193–94 (supply contract between the parties did not evince clear and unmistakable intent to refer question of arbitrability to arbitrator). Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general. *See Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801. Because the making of the arbitration agreement itself is rarely at issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests. *Id.*

Here, there is no signed agreement, no acknowledgment of receipt of the agreement, and no other evidence to suggest Owen had knowledge of the terms of the DRP. In this instance, therefore, Excel does not benefit from any presumption that the DRP is valid, and the court must as an initial matter determine whether the parties contracted to refer the question of arbitrability to an arbitrator. That is so because " '[w]hether or not a [party] is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to arbitrate the arbitrability [question].' " *Kansas City S. Transp. Co. v.*

*Teamsters Local Union # 41*, 126 F.3d 1059, 1064 (8th Cir.1997) (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 208, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (internal citations and quotations omitted)); *cf. AT & T Techs., Inc.*, 475 U.S. at 648, 106 S.Ct. 1415 ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

The position urged by Excel is similar to an argument addressed by the Supreme Court in *Litton Financial Printing*, 501 U.S. at 191, 111 S.Ct. 2215. In that case, a dispute arose when the union sought to compel arbitration of a dispute *after* the expiration of the collective bargaining agreement. *Id.* at 194–95, 111 S.Ct. 2215. Emphasizing that arbitration is a matter of contract, the Court concluded it was obligated to reach the merits of the union's post-termination grievances, because only then could the Court know whether the contractual right at issue vested under the expired contract. *Id.* at 209–10, 111 S.Ct. 2215. The Court reasoned:

> We acknowledge that where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Id.*, at 650, 106 S.Ct. at 1419 (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960)). But we refuse to apply that presumption wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate. Although " '[d]oubts

should be resolved in favor of coverage,'" *AT & T Technologies, supra*, 475 U.S. at 650, 106 S.Ct. at 1419, we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement.

*Id.* at 209, 111 S.Ct. 2215.

In this case, similar to an expired collective bargaining agreement, Excel has failed to prove the existence of an agreement to arbitrate. Therefore, there is no presumption of validity, and the court cannot compel Owen to arbitrate without first determining whether an agreement to arbitrate exists, because "a party who has not agreed to arbitrate a dispute cannot be forced to do so." *Lyster,* 239 F.3d at 945. Accordingly, it is the court's duty to determine whether the DRP constitutes a valid agreement between the parties, and to refer this issue to the arbitrator under the facts of this case would be tantamount to circumventing the purpose of the FAA. *Compare Allied–Bruce Terminix Co. v. Dobson,* 513 U.S. 265, 270–72, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (holding the FAA equalizes arbitration agreements with other contracts) (citing *Volt Information Sciences, Inc.,* 489 U.S. at 474, 109 S.Ct. 1248); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (noting that "the purpose of Congress in [enacting the FAA] was to make arbitration agreements as enforceable as other contracts, but not more so."), *with Chastain v. Robinson–Humphrey Co.,* 957 F.2d 851, 854–55 (11th Cir.1992) (requiring the district court to determine the validity of an arbitration clause where the plaintiff never personally signed the agreement); *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 816 F.2d 864, 868 (2d Cir.1987) (noting that the question of whether the plaintiff was a party to the contract was too "ambiguous"

to allow the court to enforce the arbitration agreement); *I.S. Joseph Co. v. Michigan Sugar Co.,* 803 F.2d 396, 400 (8th Cir.1986) (holding that when the plaintiff denies a contractual relationship with the defendant, the court should decide on the enforceability of the arbitration clause); *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 678 (2d Cir.1972) (allowing a trial where there is "sufficient uncertainty" as to whether the plaintiff is a party to the contract).

## III. CONCLUSION

The court finds that Excel failed to meet its burden of proof and establish that it communicated the terms of the DRP to Owen. Accordingly, the DRP did not constitute an effective offer under Iowa law, and Owen's continued employment without knowledge of the offer did not constitute acceptance. Similarly, Owen's filing of a grievance with DSI was not sufficiently unambiguous to give rise to an inference of mutual assent to the terms of the DRP, especially in light of Excel's failure to demonstrate Owen's knowledge or access to the terms of the DRP. Therefore, the court does not find an implied contract existed between the parties. And lastly, because there is no evidence of distribution or communication of the DRP, the court must not abdicate its duty under the FAA and must determine whether the DRP constitutes a valid agreement to arbitrate, notwithstanding that the DRP delegates this determination to an arbitrator. Even though the court has reviewed this agreement "with a healthy regard for the federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25, 103 S.Ct. 927, the court is unable to conclude the parties had a "meeting of the minds." Because parties must not be forced to arbitrate disputes that they did not agree to submit to arbitration, the court **denies Excel's motion to compel arbitration and stay proceed-**

ings. Accordingly, the court also **denies Excel's request for attorneys' fees.**

In addition, Excel moved to compel arbitration and stay proceedings in lieu of filing an answer to Owen's complaint. In the alternative, Excel requested an extension of twenty days from the date of this disposition in the event the court found Owen's claims were not subject to arbitration. The court has concluded that the DRP is not a valid agreement to arbitrate. Therefore, in the interests of justice, the court will **grant Excel's request for an extension of time to file an answer. Excel shall have to and including December 10, 2001 in which to answer** Owen's complaint.

**IT IS SO ORDERED.**