Patricia BRONDYKE, Plaintiff,

v.

BRIDGEPOINT EDUCATION, INC.,
d/b/a Ashford University, LLC,
Defendants.

No. 3:13–cv–00015–JEG.

United States District Court,
S.D. Iowa,
Davenport Division.

Dec. 2, 2013.

Blake Parker, Blake Parker Law Office, Clinton, IA, for Plaintiff.

Frances M. Haas, Stephanie Glenn Techau, Nyemaster Goode PC, Cedar Rapids, IA, Jeffrey A. Timmerman, Susan K. Fitzke, Littler Mendelson PC, Minneapolis, MN, for Defendants.

## ORDER

JAMES E. GRITZNER, Chief Judge.

This matter is before the Court on Motion by Defendant Bridgepoint Education, Inc. (Bridgepoint) for Partial Dismissal and to Compel Arbitration. Plaintiff Patricia Brondyke (Brondyke) resists. A hearing was not requested, and the Court finds that a hearing is not necessary. The matter is fully submitted and ready for disposition.

## I. BACKGROUND [1]

### A. Factual Background

■ Brondyke began working at Ashford University (Ashford) as the Iowa Controller in Clinton, Iowa, on December 31, 2007. Ashford is a wholly owned subsidiary of Bridgepoint, which is a publicly-traded corporation.

Brondyke signed an "Employee Responsibility & Acknowledgement" form (August 2008 Acknowledgement Form) on August 19, 2008, which stated the following:

This Employee Handbook describes important information about Bridgepoint Education, LLC. I understand that I should consult with my supervisor or a Human Resources representative regarding any questions not answered in this Handbook.

Since the information, policies and benefits described in the Handbook are subject to change, I acknowledge that revisions may occur, and I understand that such revisions may supersede, modify or eliminate existing policies. I further understand and agree that I will be bound by any such revisions during the term of my employment with Bridgepoint Education, LLC. I further understand that any revisions or exceptions to the poli-

---

1. The Court accepts as true the facts alleged in the Complaint for purposes of a Rule 12(b)(6) motion to dismiss. *See Zutz v. Nelson,* 601 F.3d 842, 848 (8th Cir.2010).

cies contained in this manual must be in writing and approved by the CEO of Bridgepoint Education, LLC.

I acknowledge that the official copy of the Employee Handbook is located on our Company Intranet under the HR Tab, and will periodically review the official copy to take note of any revisions and/or updates.

I acknowledge that I have read the Employee Handbook and understand my rights and responsibilities as a Bridgepoint Education, LLC employee. I agree to abide by the policies as set forth in the Employee Handbook.

August 2008 Acknowledgement Form, Dackerman Decl. ¶ 7–Ex. 3, ECF No. 12–7.

During the time Brondyke worked at Ashford, John Ballheim (Ballheim) was the Vice President of Bridgepoint, the Campus Director of Ashford, and Brondyke's supervisor. Ballheim had authorization credentials to approve employee expense reimbursement requests in the Concur software system, which Bridgepoint used to track employee expense reimbursement. Brondyke learned that Ballheim allowed an administrative employee to use Ballheim's authorization credentials to access the Concur software and to approve employee expenses in the system. Brondyke, believing these actions to be a breach of Bridgepoint policy regarding password security, reported the situation to human relations personnel at the university. According to Brondyke, after she made the report, Ballheim stopped communicating with Brondyke and started to denigrate Brondyke's performance at work to other Bridgepoint employees.

In October of 2011, Brondyke learned that Ballheim had again allowed an administrative employee to use Ballheim's authorization credentials to access the Concur system to approve employee expense reimbursements and reported this perceived violation of Bridgepoint policy to Bridgepoint Assistant Vice President Tom Meade. In November of 2011, Elizabeth Tice (Tice), the CEO and President of Ashford University, called Brondyke demanding that Brondyke quit complaining about Ballheim giving his authorization credentials to an administrative employee at the university. Following Brondyke's second report, Ballheim conducted Brondyke's annual evaluation and gave Brondyke lower scores than Brondyke's previous evaluation scores; this was the first time Ballheim had expressed disgruntlement with Brondyke's work.

Also in October 2011, Brondyke recommended that the Ashford University campus store manager, who was a younger individual, be discharged for mismanagement, rule violations, and insubordination reasons. Rather than discharging the campus store manager, Bridgepoint provided the campus store manager with intensive coaching and weekly meetings with Brondyke and a Bridgepoint human resources employee. However, consistent with its "Best in Class" policy, after placing in the bottom ten percent of Bridgepoint employees in an annual evaluation, Bridgepoint discharged the campus store manager.

On October 28, 2011, Bridgepoint sent an e-mail to an all-employee listserv that stated in the subject line "URGENT: Employee Handbook Update Acknowledgement Required." Bridgepoint Email of Oct. 28, 2011, Dackerman Decl. ¶ 9–Ex. 6, ECF No. 12–10. The text of the messages stated as follows:

> The latest revision of the Employee [Handbook] is now posted on the HR Insite page for you to view. You can access it immediately by clicking *here.* The revisions made within supersede, modify or eliminate existing policies.

For a snapshot of updated policies, please refer to the attached document. All employees are bound by any revisions, and must agree to and abide by the policies contained in this release.... Once you have reviewed the handbook, please log in to the ADP Self Service Portal to access the new StudyHall. You will see a course for the Employee Handbook Acknowledgement in your transcript. Click Launch to begin the acknowledgement process and follow the instructions in the course to complete the task.

Attach. to Bridgepoint Email of Oct. 28, 2011, Dackerman Decl. ¶ 9–Ex. 6, ECF No. 12–10. The document attached to this e-mail announces that in section 2.24 of the Bridgepoint Employee Handbook released on October 27, 2011 (the October 2011 Employee Handbook), "is a new provision in the Employee Handbook. The Company and employee will utilize binding arbitration to resolve all disputes that may arise out of the employment context. It is important that you read this section in the employee handbook in its entirety." *Id.*

Section two of the October 2011 Employee Handbook contains employee policies and procedures. As the email advised, subsection 2.24 of the October 2011 Employee Handbook contains the Arbitration Clause, which states as follows:

### Introduction

Binding arbitration of disputes, rather than litigation in courts, provides an effective means for resolving issues arising in or from an employment situation. Arbitration is generally faster, cheaper and less formal for all parties. Bridgepoint Education [and] Ashford University, ... (collectively referred to as "the Company") are committed to using binding arbitration to resolve all legal disputes, whether initiated by the Company or by an employee, in a forum which provides this alternative to the court system. As a condition of *employment*, employees must also agree to use the arbitration forum. The Company's agreement to use binding arbitration is confirmed by this statement; your agreement is confirmed by your acceptance or continuation of employment.

### Agreement

The Company and employee will utilize binding arbitration to resolve all disputes that may arise out of the employment context. Both the Company and employee agree that any claim, dispute, and/or controversy that either employee may have against the Company ... or the Company may have against employee, arising from, related to, or having any relationship or connection whatsoever with my seeking employment by, or other association with the Company, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act. All claims must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

### Included Claims

Included within the scope of this agreement are all disputes, whether they be based on the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation, equitable law, or otherwise, with exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers' Compensation Act, Employment Development Department claims, or as otherwise required by state or federal law.

However, nothing herein shall prevent an employee from filing and pursuing

proceedings before the California Department of Fair Employment and Housing, or the United States Equal Employment Opportunity Commission or any other similar state agency (although if such a claim is pursued following the exhaustion of such administrative remedies, that claim would be subject to these provisions). . . .

**Procedures**

In addition to any other requirements imposed by law, the arbitrator selected shall be a retired Judge, or otherwise qualified individual to whom the parties mutually agree, and shall be subject to disqualification on the same grounds as would apply to a judge of such court. The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration. Consistent with the efficiencies of arbitration, the arbitrator may also allow for the hearing of any motions, including motions for summary judgment or dismissal. Resolution of the dispute shall be based solely upon the law governing the claims and defenses pleaded, and the arbitrator may not invoke any basis (including but not limited to, notions of 'just cause') other than such controlling law. The arbitrator shall not have the authority to combine individually filed arbitrations into a class action or collective action. Awards shall include the arbitrator's written reasoned opinion.

**Severability**

Should any term or provision, or portion thereof, be declared void or unenforceable or deemed in contravention of law, it shall be severed and/or modified by the arbitrator or court and the remainder of this agreement shall be enforceable.

**Entire Agreement**

This agreement supersedes any and all prior agreements regarding arbitration.

**Jury Waiver**

The employee and the Company give up his/her/its rights to trial by jury.

Oct.2011 Emp. Handbook 21–22, Dackerman Decl. ¶ 8–Ex. 4, ECF No. 12–8.

The first two pages of the October 2011 Employee Handbook contain the "Employee Responsibility & Acknowledgement" form (the October 2011 Acknowledgement Form), which states as follows:

This Employee Handbook describes important information about Bridgepoint Education. I understand that I should consult with my supervisor or a Human Resources representative regarding any questions not answered in this Handbook.

I acknowledge that I have read the Employee Handbook and understand my rights and responsibilities, the rules and procedures described therein, and the importance of compliance therewith, as a Bridgepoint Education employee. I agree to abide by the policies, including the code of ethics, as set forth in the Employee Handbook.

**At Will**

Employment is at the mutual consent of the employee and the Company. Accordingly, either the employee or the Company can terminate the employment relationship at will, at any time, with or without cause or advance notice.

. . .

**Arbitration**

Binding arbitration of disputes, rather than litigation in courts, provides an effective means for resolving issues arising in or from an employment situation. Arbitration is generally faster, cheaper and less formal for all parties. Bridgepoint Education [and] Ashford University, . . . (collectively referred to as "the Company) are committed to using bind-

ing arbitration to resolve all legal disputes, whether initiated by the Company or by an employee, in a forum which provides this alternative to the court system. As a condition of employment, employees must also agree to use the arbitration forum. The Company's agreement to use binding arbitration is confirmed by this statement; your agreement is confirmed by your acknowledgement of this employee handbook as well as your acceptance or continuation of employment.

*Id.* at 1–2.

On November 1, 2011, Brondyke electronically signed and submitted the October 2011 Acknowledgement Form, thereby acknowledging having reviewed "[a]n outline of the changes made in the Employee Handbook as of November 2011." Verif. of Elec. Submission of Nov. 1, 2011, Dackerman Decl.-Ex. 5, ECF No. 12–9.

On December 14, 2011, Bridgepoint released an amended employee handbook (December 2011 Employee Handbook). Dec.2011 Emp. Handbook, Dackerman Decl. ¶ 6–Ex. 1, ECF No. 12–5. Aside from the addition of a paragraph about the company's "Insider Trading Policy," the December 2011 Acknowledgement Form was identical to the October 2011 Acknowledgement Form. *Id.* at 1–2. (*see also* ECF No. 16–3). The 2.24 Arbitration Clause section of the December 2011 Employee Handbook is identical to the 2.24 Arbitration Clause section of the October 2011 Employee Handbook. *Compare* Dec. 2011 Emp. Handbook 21–22, Dackerman Decl.-Ex. 1, ECF No. 12–5, *with* Oct. 2011 Emp. Handbook 21–22, Dackerman Decl.-Ex. 4, ECF No. 12–8. On February 6, 2012, Brondyke electronically signed and submitted the December 2011 Acknowledgement Form, thereby acknowledging having

reviewed "[a]n outline of the changes made in the Employee Handbook as of November 2011." Verif. of Elec. Submission of Feb. 6, 2012, Dackerman Decl. ¶ 6–Ex. 2, ECF No. 12–6.

On March 1, 2012, Brondyke was discharged for not meeting the "Best in Class" standards. Brondyke was never in the bottom ten percent of employees after an annual evaluation and was never given any intensive coaching like the campus store manager received before being discharged.

### B. Procedural Background

On June 6, 2012, after her discharge, Brondyke filed an administrative complaint with the Occupational Safety and Health Administration (OSHA) asserting Bridgepoint violated the "whistleblower" provisions of the Sarbanes–Oxley Act of 2002, 18 U.S.C. § 1514A (SOX). OSHA did not issue a final decision on Brondyke's complaint within the 180–day statutory period.

Brondyke filed the Complaint in this case on February 1, 2013, alleging that (1) Bridge-point violated anti-retaliation provisions of SOX, (2) Brondyke was wrongfully discharged in violation of public policy, and (3) Bridgepoint discriminated against Brondyke on the basis of her age in violation of the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216. Bridgepoint filed an Answer on February 28, 2013. Bridgepoint filed its Motion for Partial Dismissal and Motion to Compel Arbitration on May 13, 2013, which Brondyke resists.

### II. DISCUSSION [2]

#### A. Standard

Bridgepoint argues that dismissal is warranted in this case under the Federal

---

**2.** Bridgepoint concedes that Brondyke's SOX claim in Count I of her Complaint is not subject to arbitration under 18 U.S.C. § 1514A(e)(2); thus, the Court only needs to determine whether to compel arbitration of Counts II and III of Brondyke's Complaint.

Arbitration Act (FAA), 9 U.S.C. § 1 et seq., as well as under Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6).[3]

▆▆▆ "The Federal Arbitration Act reflects an emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi,* —— U.S. ——, 132 S.Ct. 23, 25, 181 L.Ed.2d 323 (2011) (per curiam) (citation and internal quotation marks omitted). "This policy, as contained within the Act, requires courts to enforce the bargain of the parties to arbitrate, and cannot possibly require the disregard of state law permitting arbitration by or against nonparties to the written arbitration agreement." *Id.* (internal citations and quotation marks omitted).

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Bank of Am., N.A. v. UMB Fin. Servs., Inc.,* 618 F.3d 906, 911 (8th Cir.2010) (citation and internal quotation marks omitted). "The scope of an arbitration agreement is given a liberal interpretation, with any doubts resolved in favor of arbitration." *MedCam, Inc. v. MCNC,* 414 F.3d 972, 975 (8th Cir.2005). Further, "[a]n order compelling arbitration 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* (quoting *Lyster v. Ryan's Family Steak Houses, Inc.,* 239 F.3d 943, 945 (8th Cir.2001)).

▆▆▆ "In determining whether statutory claims may be arbitrated, we first ask whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In deciding a motion to compel, the Court "determine[s] only 'whether there is a valid agreement to arbitrate and whether the specific dispute at issue falls within the substantive scope of that agreement.'" *Bailey v. Ameriquest Mortg. Co.,* 346 F.3d 821, 822 (8th Cir.2003) (quoting *Larry's United Super, Inc. v. Werries,* 253 F.3d 1083, 1085 (8th Cir.2001)). "[T]he question of scope asks only whether the parties have agreed to arbitrate a particular claim and does not reach the potential merits of the claim." *MedCam,* 414 F.3d at 975.

▆▆▆ "[C]ourts must examine a complaint with care to assess whether any individual claim must be arbitrated. The failure to do so is subject to immediate review." *KPMG,* 132 S.Ct. at 26. When the Court is considering a motion to compel arbitration, "the Court is free to con-

---

**3.** The Eighth Circuit addresses motions to compel under the FAA but notes they are akin to 12(b)(6) motions, *see Suburban Leisure Ctr., Inc. v. AMF Bowling Prods., Inc.,* 468 F.3d 523, 525 (8th Cir.2006) ("For the purpose of ruling on AMF's motion to dismiss or in the alternative to compel arbitration, the district court assumed the truth of the allegations in Suburban's complaint. With the limited purpose of reviewing the district court's ruling, we, too, view Suburban's allegations as true" (citing *Palcko v. Airborne Express, Inc.,* 372 F.3d 588, 597 (3d Cir.2004) (stating that a motion to compel arbitration is generally treated as a motion to dismiss for failure to state a claim upon which relief can be granted)); and *Manion v. Nagin,* 394 F.3d 1062, 1065 (8th Cir.2005) (viewing factual allegations as true for purposes of a motion to dismiss)). The Eighth Circuit "review[s] *de novo* the district court's denial of a motion to compel arbitration based on contract interpretation," *id.,* and "[p]ursuant to the FAA, [the court] construe[s] the arbitration clause resolving any doubts in favor of arbitration," *id.* at 526.

sider materials beyond the pleadings" without converting the motion to one for summary judgment under Rule 56. *Heath v. Travelers Cos., Inc.*, No. Civ. 08–6055, 2009 WL 1921661, at *3 (D.Minn. July 1, 2009).[4]

### B. The Arbitration Agreement

Bridgepoint contends that Count II and Count III of Brondyke's Complaint are subject to an arbitration agreement. Brondyke resists, arguing she is not bound by the Arbitration Clause contained in the October 2011 or December 2011 Employee Handbooks.

 Under the FAA,

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

> The final phrase of § 2 ... permits arbitration agreements to be declared unenforceable upon such grounds as exist at

law or in equity for the revocation of any contract. This saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.

*AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011) (citation and internal quotation marks omitted). "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *Id.* at 1747. "The principal purpose of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms." *Id.* at 1748 (alteration in original) (citation and internal quotation marks omitted). "Section 3, in turn, allows litigants already in federal court to invoke agreements made enforceable by § 2. That provision requires the court, on application of one of the parties, to stay the action if it involves an issue referable to arbitration under an agreement in writing." *Bank of Am.,* 618 F.3d at 911 (quoting *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)). However,

---

**4.** Brondyke asserts that consideration of the Arbitration Agreement contained in the Employee Handbook improperly transforms this Motion into a Rule 56 motion for summary judgment. This argument is contrary to Eighth Circuit law, which specifies that in ruling on a motion to compel arbitration, a court must conduct a limited review of the arbitration provision, and thus necessarily anticipates consideration of documents that may lay outside the pleadings. *See, e.g., Suburban,* 468 F.3d at 525 (noting that motions to compel are "are akin to 12(b)(6) motions," but that the court will restrict its review of the agreement to the determination of whether the parties have agreed to arbitrate the dis-

puted issue, which is a question of contract interpretation); *MedCam,* 414 F.3d at 974 ("[T]he FAA limits a district court's initial role in any challenge to an arbitration agreement to deciding whether 'the making of the agreement for arbitration or the failure to comply therewith' is at issue." (quoting 9 U.S.C. § 4 (2000))); *Bob Schultz Motors, Inc. v. Kawasaki Motors Corp., U.S.A.,* 334 F.3d 721, 726 (8th Cir.2003) ("Although § 4 [of the FAA] imbues the federal courts with only limited powers in the context of a party's motion to compel arbitration, it is clear that the validity of the arbitration clause and its applicability to the dispute at hand are questions for the district court to decide.").

"[a] party who has not agreed to arbitrate a dispute cannot be forced to do so." *Id.*

The agreement at issue here is set forth in the Arbitration Clause located in section 2.24 of the October 2011 Employee Handbook.

**Introduction**

. . .

Bridgepoint Education ... [is] committed to using binding arbitration to resolve all legal disputes, whether initiated by the Company or by an employee, in a forum which provides this alternative to the court system. As a condition of employment, employees must also agree to use the arbitration forum. The Company's agreement to use binding arbitration is confirmed by this statement; your agreement is confirmed by your acceptance or continuation of employment.

**Agreement**

The Company and employee will utilize binding arbitration to resolve all disputes that may arise out of the employment context. Both the Company and employee agree that any claim, dispute, and/or controversy that either employee may have against the Company ... or the Company may have against employee, arising from, related to, or having any relationship or connection whatsoever with my seeking employment by, or other association with the Company, shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act. All claims must be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

**Included Claims**

Included within the scope of this agreement are all disputes, whether they be based on the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation, equitable law, or otherwise....

Oct.2011 Emp. Handbook 21–22, Dackerman Decl. ¶ 8–Ex. 4, ECF No. 12–8.

### 1. Contract Principles

 "[C]ourts must place arbitration agreements on an equal footing with other contracts ... and enforce them according to their terms." *AT & T*, 131 S.Ct. at 1745. "The question of whether a dispute should be arbitrated under a contract is one of contract interpretation...." *Bank of Am.*, 618 F.3d at 911 (footnote omitted). The Court applies " 'ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter,' giving 'healthy regard for the federal policy favoring arbitration.' " *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 242 F.3d 777, 780 (8th Cir.2001) (quoting *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir.1999)); *see also Trogden v. Pinkerton's Inc.*, No. 4:02–cv–90494, 2003 WL 21516580, at *3 (S.D.Iowa May 8, 2003) ("Arbitration is a matter of contract and state law contract principles determine whether the parties have agreed to arbitrate a dispute."). "Except when there is ambiguity, the question of whether a written instrument such as an employee handbook binds the parties in contract is a question of law." *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993). There is no dispute that Iowa law governs the Court's inquiry. *See* Def.'s Br. 8, ECF No. 12–1; Pl.'s Br. 6–7, ECF No. 16–4.

 Under Iowa law, the elements of a contract are an offer, acceptance, and consideration. *Taggart v. Drake Univ.*, 549 N.W.2d 796, 800 (Iowa 1996); *see also Trogden*, 2003 WL 21516580, at *3 (same). "An employee handbook may create a unilateral contract if (1) the handbook is sufficiently definite in its terms to create an *offer*; (2) the handbook has been communi-

cated to and accepted by the employee so as to constitute *acceptance;* and (3) the employee continues working, to provide *consideration." Thompson v. City of Des Moines,* 564 N.W.2d 839, 844 (Iowa 1997). "The law of unilateral contracts is not limited to contracts for continued employment. Under Iowa law, a unilateral contract exists wherever an offeror makes a promise and an offeree renders some performance as acceptance." *Kartheiser v. Am. Nat'l Can Co.,* 84 F.Supp.2d 1008, 1012 (S.D.Iowa 1999) (citing *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 25 (Iowa 1997)); *see also Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 283 (Iowa 1995) ("A unilateral contract consists of an offeror making a promise and an offeree rendering some performance as acceptance."). "Under the unilateral contract theory, the party claiming the contract carries the burden to prove its existence." *Kartheiser,* 84 F.Supp.2d at 1012 (citing *Thompson,* 564 N.W.2d at 844).

### 2. Offer

■■■■ "As with any contract dispute, [the Court] first look[s] to the express terms...." *Pro Tech Indus., Inc. v. URS Corp.,* 377 F.3d 868, 871 (8th Cir.2004). "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it." *Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 203 (Iowa 1997) (alteration in original) (citation and internal quotation marks omitted); *see also Anderson,* 540 N.W.2d at 286 ("The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." (citation and internal quotation marks omitted)); *Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.,* 481 N.W.2d 510, 514 (Iowa 1992) ("As is true of contract formation in general, the parties to an employ-

ment contract must manifest their assent to be bound and do so in a manner that is sufficiently definite to be enforceable."). "If an offer is indefinite, there is no intent to be bound." *Phipps,* 558 N.W.2d at 203.

■■■■ "We look for the existence of an offer objectively, not subjectively." *Id.* "In conducting our objective inquiry, we look for terms with precise meaning that provide certainty of performance." *Id.; see also Anderson,* 540 N.W.2d at 286 ("When objectively examining the handbook to determine intent to create an offer, we look for terms with precise meaning that provide certainty of performance."). "The standard is what a normally constituted person would have understood [the words] to mean, when used in their actual setting." *Anderson,* 540 N.W.2d at 286 (citation and internal quotation marks omitted).

#### a. Definiteness of Offer

■■■■ "When considering whether a handbook is objectively definite to create a contract we consider its language and context." *Id.* (citations and internal quotation marks omitted). In making this determination, Iowa courts look to the following factors: "a) whether the policy is a mere guideline or a directive; b) whether the language of the policy is detailed and definite or general and vague; and c) whether the employer has the power to alter the procedures at will or whether they are invariable." *Kartheiser,* 84 F.Supp.2d at 1013 (citing *Anderson,* 540 N.W.2d at 286–87; *Jones v. Lake Park Care Ctr., Inc.,* 569 N.W.2d 369, 375 (Iowa 1997). "[A]n employer's power to alter the procedures at will is but one factor in the court's determination of definite-ness." *Owen v. MBPXL Corp.,* 173 F.Supp.2d 905, 920 (N.D.Iowa 2001).

#### (1) Guideline or Directive

■■■■ The December 2011 Employee Handbook sets forth several guidelines,

though the introductory pages entitled "Employee Responsibility & Acknowledgement" provide a tone that is more appropriately considered a directive. This section states that employment for Bridgepoint is at-will before setting forth an abbreviated version of the Arbitration Clause set forth in full on pages 21 and 22 of the December 2011 Employee Handbook. The arbitration portion of this introductory section states that Bridgepoint is "committed to using binding arbitration to resolve all legal disputes" with its employees, and "[a]s a condition of employment, employees must also agree to use the arbitration forum." Dec.2011 Emp. Handbook, ECF No. 16–3. This language indicates that the December 2011 Employee Handbook is not just a collection of guidelines that Bridgepoint *hopes* its employees will follow, but rather mandatory directives that place conditions on employment to which Bridgepoint is also bound. The December 2011 Employee Handbook satisfies the first factor of the definiteness test.

#### (2) Detailed and Definite or General and Vague

The language used in the December 2011 Employee Handbook in general, and in the Arbitration Clause specifically, is detailed and definite. The December 2011 Employee Handbook contains 68 pages and has 9 separate sections that detail employee, company, work place, and wage policies; employee and discretionary benefits; time off; and termination of employment. The Arbitration Clause, which is in the employee policies and procedures section of the Employee Handbook, sets forth parameters for the types of claims that must be arbitrated, the procedure by which the parties must arbitrate their claims, and the fact that both parties—employer and employee—are bound to arbitrate claims arising out of the employment relationship. The Arbitration Clause does not contain any language disclaiming that it is *not* intended to bind the employer and employee to its terms.[5] Bridgepoint used mandatory language in its handbook, indicating that it intended to provide a directive to its employees about a number of subjects—including arbitration—as opposed to providing a general policy statement, satisfying the second factor of the definiteness test. *See Owen,* 173 F.Supp.2d at 920 (holding that "the very language of the plan sets out specific duties applicable to both parties and underscores these duties with a recognition that they are binding on both parties").

#### (3) Alterable or Invariable Procedures

Brondyke takes issue with the fact that the December 2011 Employee

---

**5.** "A disclaimer can prevent the formation of a contract by clarifying the employer's intent not to make an offer." *Phipps,* 558 N.W.2d at 204.

A disclaimer should be considered in the same manner as any other language in the handbook to ascertain its impact on our search for the employer's intent. Therefore, we reject any special requirements for disclaimers; we simply examine the language and context of the disclaimer to decide whether a reasonable employee, reading the disclaimer, would understand it to mean that the employer has not assented to be bound by the handbook's provisions.

*Anderson,* 540 N.W.2d at 288.

The Iowa Supreme Court has held that if a disclaimer is found in an employee handbook, it "unequivocally applies to the entire employee handbook." *Anderson,* 540 N.W.2d at 288–89 (finding that the "handbook [was] not sufficiently definite to constitute a valid offer").

Brondyke fails to point to any language in the December 2011 Employee Handbook, or the Arbitration Clause specifically, that constitutes a "disclaimer" that Bridgepoint did not intend to create an offer when it provided the December 2011 Employee Handbook to its employees.

Handbook can be changed at any time by Bridgepoint, and employees are still bound. However, "an employment contract terminable at will is subject to modification at any time by either party as a condition of its continuance." *Kartheiser,* 84 F.Supp.2d at 1013 (quoting *Dallenbach v. MAPCO Gas Prods., Inc.,* 459 N.W.2d 483, 487 (Iowa 1990)). "In such a case, an employee's decision to continue work after an announced change in the terms of employment is an acceptance of the new terms as a matter of law." *Id.* (quoting *Dallenbach,* 459 N.W.2d at 487). Reserving the right to change the provisions of an employee handbook is not sufficient to defeat the creation of a contract, but rather one factor to consider when analyzing the definiteness of an offer. *See Jones,* 569 N.W.2d at 376. Similar to the circumstances in *Owen,* "when viewed in the context of the other provisions, which are decidedly mandatory and binding, [Bridgepoint's] ability to amend ... [the December 2011 Employee Handbook] does not defeat the otherwise clear and definite terms of the [December 2011 Employee Handbook]." *Owen,* 173 F.Supp.2d at 920.

Based on the multi-factor test set forth by the Iowa Supreme Court, the Employment Handbook—including the Arbitration Clause—sets forth the terms of an agreement in a sufficiently definite manner so as to constitute an offer to Brondyke. Bridgepoint promised to abide by the terms in the December 2011 Employee Handbook, and Brondyke (and Bridgepoint's other employees) accepted the terms of the agreement by electronically submitting an acknowledgement form and/or by continuing to work for Bridgepoint. The Court finds that the December 2011 Employee Handbook satisfies the definiteness requirements for expressing an "offer" to Brondyke.

### b. Knowledge of Offer

Brondyke asserts she was given a letter stating that Ashford University agreed to hire her at the start of her employment, and that her employment was at will. Then, approximately eight months later, she was requested to acknowledge review of the company's employee handbook, at which time she signed the August 2008 Acknowledgement Form and continued to work for the company. Bridgepoint asserts that Brondyke was given specific notice of the Arbitration Clause in the October 2011 and December 2011 Employee Handbooks before she submitted the October 2011 and December 2011 Acknowledgement Forms, that Bridgepoint made the handbook available to Brondyke, and that Brondyke acknowledged she had reviewed the handbook on multiple occasions—including the Arbitration Clause contained therein.

 Under Iowa law, "[t]he offeree must know of the offer before there can be mutual assent." *Trogden,* 2003 WL 21516580, at *4 (quoting *Anderson,* 540 N.W.2d at 283). Iowa "decline[s] to follow the traditional requirement that knowledge of the offer is a prerequisite to acceptance *in the limited context of employee handbook cases.*" *Anderson,* 540 N.W.2d at 284. "An offeree is charged with constructive knowledge of an offer if the offeree has the opportunity to read it; actual knowledge is not essential to the formation of a contract." *Trogden,* 2003 WL 21516580, at *4 (citing *Owen,* 173 F.Supp.2d at 924 ("[T]his rule that a party's failure to read an agreement will not prevent the formation of a contract assumes that the party seeking to avoid enforcement had the opportunity to read the contract.")).

In *Trogden,* 2003 WL 21516580, at *4, the court found that the employee "had an opportunity to read the handbooks, and

there is no question about her capacity, being misled, or fraud. She is therefore charged with knowledge of the arbitration provision in them and the incorporated reference to the terms and conditions in the program brochure." *Id.* The court noted that although "the terms and conditions of the arbitration program were contained in a document other than the handbook," this was "not significant to the analysis because the handbook gave Trogden notice and an opportunity to inform herself." *Id.* at *5. The court found that "[a] contractual agreement to arbitrate between Trogden and Pinkerton resulted when, as provided in the offer represented by the arbitration program brochure, Trogden continued her employment with Pinkerton under the mutual promises to arbitrate." *Id.* This was because "[t]he offer was communicated to Trogden by the arbitration provision in the employee handbook she received and its reference to the brochure for the terms and conditions." *Id.*

 The court reasoned that the fact that the employee "did not read the handbook and was not separately provided with the brochure d[id] not prevent formation of the arbitration agreement because she [wa]s charged with knowledge of the handbook and the contents of the arbitration program brochure it incorporates." *Id.* Indeed, under Iowa law, "[a]n agreement to arbitrate is to be treated like any other contract, and a failure to fully read and consider the contract cannot relieve him of its provisions. This rule applies to contracts ... that incorporate documents by reference." *Bryant v. Am. Exp. Fin. Advisors, Inc.,* 595 N.W.2d 482, 486 (Iowa 1999). Further, "[i]t is certainly the law in Iowa that where a handbook is actually distributed to employees, a given employee need not have actual knowledge of a policy or disclaimer to enforce it or have it enforced against him or her." *Kartheiser,* 84

F.Supp.2d at 1015 (citing *Anderson,* 540 N.W.2d at 284).

 Brondyke acknowledged on at least three occasions that she was provided access to the company employee handbook and that she had reviewed its provisions—in 2008, 2011, and 2012. The Arbitration Clause was included in the October 2011 and December 2011 Employee Handbooks when Brondyke submitted the October 2011 and December 2011 Acknowledgement Forms. In addition, Brondyke received an email on October 28, 2011, alerting her that the company's employee handbook had been updated, and the attachment to the email specifically announced that the updated October 2011 Employee Handbook contained a new provision and explained that Bridgepoint would be utilizing "binding arbitration to resolve all disputes that may arise out of the employment context" and that it was "important that [Brondyke] read this section in the employee handbook in its entirety." Bridgepoint Email of Oct. 28, 2011, Dackerman Decl. ¶ 9–Ex. 6, ECF No. 12–10. The December 2011 Employee Handbook contained an identical Arbitration Clause. Under the circumstances of this case, regardless whether Brondyke actually read the December 2011 Employee Handbook or its Arbitration Clause, Iowa law charges Brondyke with notice of the provisions contained in the December 2011 Employee Handbook because Bridgepoint provided Brondyke access to the document. *See Anderson,* 540 N.W.2d at 284. The Court finds that Bridgepoint communicated its "offer" to Brondyke such that she is imparted with knowledge of the "offer."

### 3. Acceptance

 "An acceptance is 'manifestation of assent to terms thereof made by

the offeree in a manner invited or required by the offer.'" *Van Arkel v. Warren Cnty.*, 365 F.Supp.2d 979, 987 (S.D.Iowa 2005) (quoting *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 270 (Iowa 2001)). Brondyke continued to work for Bridgepoint after she was provided with access to the December 2011 Employee Handbook and its modifications, thereby manifesting her assent to the terms of the December 2011 Employee Handbook and its Arbitration Clause by performance. Based on this record, the Court finds that under Iowa law, Brondyke accepted Bridgepoint's offer.

### 4. Consideration

Consideration is also a necessary contract element under Iowa law. *See id.* (citing *Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26–27 (Iowa 1997)). "[C]ontinued employment and the mutual promise to resolve disputes according to the terms of the plan" constitutes consideration that supports a contract under Iowa law. *Owen*, 173 F.Supp.2d at 914; *see also Fogel v. Trustees of Iowa Coll.*, 446 N.W.2d 451, 456 (Iowa 1989) (noting that an employee continuing to work constitutes consideration). In this case, both Bridgepoint and Brondyke have provided consideration. Brondyke's continued employment and the parties' mutual promise to resolve their disputes in binding arbitration constitute consideration under Iowa law.

### 5. Unconscionability

"Generally, when deciding whether an arbitration provision is unconscionable, courts apply ordinary state-law principles governing the formation of contracts." *Pro Tech Indus.*, 377 F.3d at 872. "Under Iowa law, the burden of proof that a particular provision or contract is unconscionable rests on the party claiming it is unconscionable." *Faber v. Menard, Inc.*, 367 F.3d 1048, 1053 (8th Cir.2004) (citing *In re Estate of Ascherl*, 445 N.W.2d 391, 392 (Iowa Ct.App.1989)). "The Iowa Supreme Court has established that we should analyze the following factors of unconscionability: (1) assent; (2) unfair surprise; (3) notice; (4) disparity of bargaining power; and (5) substantive unfairness." *Id.* (citing *Home Fed. Sav. & Loan Ass'n v. Campney*, 357 N.W.2d 613, 618 (Iowa 1984) (stating "that a court considering a claim of unconscionability should examine the factors of assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness")).

"The ultimate conclusion of whether a provision is unconscionable is to be made 'in view of all the circumstances.'" *Id.* (quoting *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 181 (Iowa 1975)). "A bargain is substantively unfair and therefore unconscionable 'if it is such as no person in his or her senses and not under delusion would make on the one hand, and as no honest and fair person would accept on the other.'" *Id.* (quoting *Home Fed. Sav.*, 357 N.W.2d at 619–20). "A provision will be invalidated if it is a 'nefarious provision, inimical to the public good.'" *Id.* (quoting *Home Fed. Sav.*, 357 N.W.2d at 618).

Brondyke fails to illustrate lack of assent, lack of notice, or unfair surprise in this case, as she submitted the October 2011 and December 2011 Acknowledgement Forms after Bridgepoint provided her with access to the October 2011 and December 2011 Employee Handbooks—which included the Arbitration Clause at issue—and she continued her employment with Bridgepoint after submitting the acknowledgement forms.

With regard to the disparity in bargaining power factor, "a finding that a contract is adhesive does not require a determination of unconscionability. It

merely alerts the court that the situation is one in which such a finding may be justified." *Home Fed. Sav.*, 357 N.W.2d at 619. "Mere inequality in bargaining power does not make the contract automatically unconscionable, however, and is not enough by itself to overcome the federal policy favoring arbitration." *Faber*, 367 F.3d at 1053 (citation omitted). "The disparity of bargaining power nevertheless calls for careful scrutiny of the substance of the contract." *Id.* Although Bridgepoint drafted the Employee Handbook and Arbitration Clause, and it had the sole power to modify the terms over time, the Court must look at "all the circumstances," not just the modification process, in determining whether a contract is unconscionable. *Id.* (quoting *C & J Fertilizer, Inc.*, 227 N.W.2d at 181).

After review of the December 2011 Employee Handbook, the Court finds that the substance of the December 2011 Employee Handbook—and specifically the Arbitration Clause—is not unconscionable. Bridgepoint agreed to arbitrate its claims against Brondyke, and it set forth specific procedures and the scope of arbitrable claims to ensure clarity for employees who had grievances against the company. There is nothing "nefarious" or "inimical to the public good" contained in the December 2011 Employee Handbook or the way in which it was presented to Bridgepoint employees. *Id.* (quoting *Home Fed. Sav.*, 357 N.W.2d at 618). There is strong judicial support for arbitration as an alternative dispute resolution process, *see infra* Part II.A, and Brondyke was relinquishing only her choice of forum not her right to have her claims heard. Thus, the Court finds that the December 2011 Employee Handbook and its Arbitration Clause are not unconscionable under Iowa law.

### C. Waiver of Right to Arbitrate

 Brondyke contends Bridgepoint has waived any right to arbitrate,

even if there is a valid arbitration agreement between the parties. "A party may be found to have waived its right to arbitration if it: (1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts." *Lewallen v. Green Tree Servicing, L.L.C.*, 487 F.3d 1085, 1090 (8th Cir.2007) (citation and internal quotation marks omitted). "[I]n light of the strong federal policy in favor of arbitration, any doubts concerning waiver of arbitrability should be resolved in favor of arbitration." *Id.* (alteration in original) (quoting *Dumont v. Saskatchewan Gov't Ins.*, 258 F.3d 880, 886 (8th Cir.2001)).

### 1. Knowledge

 It is indisputable that the party that creates an employee handbook knows about any arbitration agreement contained therein. *See Erdman Co. v. Phx. Land & Acquisition, LLC*, 650 F.3d 1115, 1118 (8th Cir.2011) (finding it obvious that the first factor was met because "a sophisticated party with over fifty years of health care facility design and construction, drafted the Contract containing detailed mediation and arbitration provisions, and is presumed to know its contents"). Bridgepoint created the December 2011 Employee Handbook and the Arbitration Clause set forth therein; the knowledge element is therefore met in this case.

### 2. Inconsistency

 "A party acts inconsistently with its right to arbitrate if the party [s]ubstantially invoke[s] the litigation machinery before asserting its arbitration right." *Lewallen*, 487 F.3d at 1090 (alterations in original) (citation and internal quotation marks omitted). "A party substantially invokes the litigation machinery when, for example, it files a lawsuit on arbitrable claims, engages in extensive discovery, or

fails to move to compel arbitration and stay litigation in a timely manner." *Id.* "To safeguard its right to arbitration, a party must do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Erdman,* 650 F.3d at 1118 (citation and internal quotation marks omitted).

▮ Brondyke argues that Bridgepoint acted inconsistently with its right to arbitration because it did not raise the issue during the administrative process before the ICRC, EEOC, or OSHA. However, the Eighth Circuit found it to be a sensible action for employers to allow employees to utilize the administrative process and wait until litigation commences to address the arbitrability of the employee's claims. *See McNamara v. Yellow Transp., Inc.,* 570 F.3d 950, 958 (8th Cir.2009) (adopting the First Circuit's efficiency argument propounded in *Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1, 15–16 (1st Cir. 2005), that an "employer's participation in EEOC proceedings without making an arbitration request did not reflect a desire to waive arbitration rights"). Further, Bridgepoint raised the issue of arbitration in its Answer as an affirmative defense, filed just twenty-seven days after Brondyke filed her Complaint in this case. Bridgepoint again raised arbitration approximately two and one-half months later in its Motion for Partial Dismissal and Motion to Compel Arbitration. Bridgepoint did not act inconsistently with its interest in arbitrating the matters before the Court.

### 3. Prejudice

▮ Brondyke also failed to demonstrate the prejudice element of the waiver test.

There is an overriding policy favoring arbitration, and the waiver of that right is not to be lightly inferred. The mere delay in seeking a stay of *litigation with* some resultant prejudice to a party cannot be deemed a waiver. The essential test for waiver of arbitration requires conduct or activity inconsistent with the right to arbitration *and* prejudice to the party claiming waiver.

*Bryant,* 595 N.W.2d at 487 (citation and internal quotation marks omitted).

Even where a party has acted inconsistently with its right to arbitrate, it has not waived that right unless its actions prejudice the other party. A party is so prejudiced when the parties use discovery not available in arbitration, when they litigate substantial issues on the merits, or when compelling arbitration would require a duplication of efforts.

*Lewallen,* 487 F.3d at 1093 (citation and internal quotation marks omitted). "Whether inconsistent actions constitute prejudice is determined on a case-by-case basis." *Stifel, Nicolaus & Co., Inc. v. Freeman,* 924 F.2d 157, 159 (8th Cir.1991). "The prejudice threshold ... is not onerous." *Erdman,* 650 F.3d at 1119 (alteration in original) (citation and internal quotation marks omitted).

▮ Although Brondyke alleges prejudice because she remains unemployed and without pay or benefits and is concerned about duplication of efforts because the Court would be hearing the SOX claim while the other two claims are arbitrated, this does not meet the threshold for prejudice in the Eighth Circuit. The Court is *required* to compel arbitration for arbitrable claims, while keeping any non-arbitrable claims in federal court; thus, the FAA implicitly allows some duplication of effort by litigants. *See KPMG,* 132 S.Ct. at 25–26 ("[T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration

agreement has been signed." (citation and internal quotation marks omitted)). "Thus, when a complaint contains both arbitrable and nonarbitrable claims, the Act requires courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Id.* (citation and internal quotation marks omitted). "A court's role under the FAA is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Pro Tech Indus.*, 377 F.3d at 871.

Bridgepoint acted expeditiously in asserting its right to arbitrate, and the Court finds that Brondyke has not presented any facts to support her allegation that she is prejudiced by the Court compelling arbitration of claims that fall within the scope of the parties' arbitration agreement. Thus, to the extent any of Brondyke's claims are subject to the binding arbitration agreement between Brondyke and Bridgepoint, the Court finds that Bridgepoint has not waived its right to compel arbitration.

### D. Arbitrability of Brondyke's Claims

 The Court "recognize[s] an agreement to arbitrate is a matter of contract, and 'is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Id.* (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Simmons Foods, Inc. v. H. Mahmood J. Al–Bunnia & Sons Co.*, 634 F.3d 466, 468–

69 (8th Cir.2011) (alteration in original) (citation and internal quotation marks omitted). "An arbitration clause may establish a presumption of arbitrability, but the presumption may be overcome by an express provision excluding a particular grievance from arbitration or by persuasive evidence of a purpose to exclude the claim from arbitration." *Local 38N Graphic Commc'ns Conference/IBT v. St. Louis Post–Dispatch, LLC*, 638 F.3d 824, 826 (8th Cir.2011).

The Arbitration Clause in this case provides guidance as to its scope:

**Agreement**

The Company and employee will utilize binding arbitration *to resolve all disputes that may arise out of the employment context.* Both the Company and employee agree that *any claim, dispute, and/or controversy that either employee may have against the Company ... or* the Company may have against employee, *arising from, related to, or having any relationship or connection whatsoever with my seeking employment by, or other association with the Company,* shall be submitted to and determined exclusively by binding arbitration under the [FAA]....

**Included Claims**

Included within the scope of this agreement are *all disputes, whether they be based on the California Fair Employment and Housing Act, Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation, equitable law, or otherwise,* with exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers' Compensation Act, Employment Development Department claims, or as otherwise required by state or federal law.

However, nothing herein shall prevent an employee from filing and pursuing proceedings before the California Department of Fair Employment and Housing, or the United States Equal Employment Opportunity Commission or any other similar state agency (although if such a claim is pursued following the exhaustion of such administrative remedies, that claim would be subject to these provisions)....

Dec.2011 Emp. Handbook 21, ECF No. 16–3 (emphasis added).

 "It is now well established that agreements between an employer and employee to arbitrate disputes, including disputes arising under the laws against employment discrimination, are arbitrable under § 2." *Trogden,* 2003 WL 21516580, at \*3. "In determining whether statutory claims may be arbitrated, [the court] first ask[s] whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."[6] *Green Tree,* 531 U.S. at 90, 121 S.Ct. 513. "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration .... that Congress intended to preclude arbitration of the statutory claims at issue." *Id.* at 91, 121 S.Ct. 513. "[E]ven claims arising under a statute designed to further important social policies may be arbitrated because so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute serves its functions, ..." *Id.* at 90, 121 S.Ct. 513 (second

alteration in original) (citation and internal quotation marks omitted).

 Both Brondyke's wrongful discharge and age discrimination claims are within the scope of the Arbitration Clause. These claims arise out of Brondyke's employment at Bridgepoint. The Arbitration Clause specifically states that "[t]he Company and employee will utilize binding arbitration *to resolve all disputes that may arise out of the employment context,*" and that "[i]ncluded within the scope of this agreement are *all disputes, whether they be based on ... [any] ... state or federal law or regulation, equitable law or otherwise ...*" Dec. 2011 Emp. Handbook 21, ECF No. 16–3. Brondyke fails to present any argument to the contrary. Congress has not stated an intent to preclude either of these types of claims from arbitration, and the Court is therefore required to compel arbitration of these claims in accordance with the binding arbitration agreement between the parties.

## IV. CONCLUSION

For the reasons stated, Defendant Bridgepoint's Motion for Partial Dismissal and Motion to Compel Arbitration, ECF No. 12, must be **granted in part and denied in part.** Counts II and III of the Complaint are **dismissed.** The request for attorneys fees and costs is unsupported legally or factually on this record and must be **denied.**

**IT IS SO ORDERED.**

---

6. "[W]hile a party does not forgo substantive statutory rights by agreeing to arbitrate statutory claims, the Court has evidenced its confidence that arbitrators are perfectly capable of protecting statutory rights when the parties have conferred the authority to decide statutory claims." *Bailey,* 346 F.3d at 823

(citation omitted). "When an agreement to arbitrate encompasses statutory claims, the arbitrator has the authority to enforce substantive statutory rights, even if those rights are in conflict with contractual limitations in the agreement that would otherwise apply." *Id.* at 824.